### CITY OF MANCHESTER et al. v. LEIBY et al.

No. 3630.

Circuit Court of Appeals, First Circuit.

Feb. 17, 1941.

662

John E. Tobin, of Manchester, N. H., for appellants.

Hayden C. Covington, of Brooklyn, N. Y. (Joseph F. Rutherford, of Brooklyn, N. Y., on the brief), for appellees.

Before MAGRUDER and MAHONEY, Circuit Judges, and HARTIGAN, District Judge.

MAGRUDER, Circuit Judge.

Milton L. Leiby and twelve other individuals joined with the Watchtower Bible and Tract Society, Inc., a New York corporation, in a complaint against the city of Manchester, New Hampshire, the chief of police thereof and the justice of the municipal court, seeking an injunction restraining the defendants from enforcing a certain municipal ordinance alleged to be invalid.

The individual plaintiffs are alleged to be all residents of the State of New Hampshire. They are certified by the Watchtower Bible and Tract Society as being among the company of Jehovah's witnesses and as being authorized by the Society to preach the gospel of God's kingdom and to

disseminate the message of the gospel in printed form. The plaintiffs have been engaged in street distribution in Manchester of two magazines put out by the Society, The Watchtower, "Announcing Jehovah's Kingdom," and Consolation, a "Journal of Fact, Hope and Courage." These magazines are sold for five cents a copy. From persons receiving them the plaintiffs usually take a money contribution, but copies are given away to persons unable to pay for them.

Chapter 39 of the ordinances of the city of Manchester is assailed as void under the due process clause of the Fourteenth Amendment in that it unduly infringes upon the free exercise of religion and the freedom of speech and of the press. This ordinance, which has been in force since 1912, reads as follows:

"Newsboys and Bootblacks.

"Section 1. No person shall, in any street or public place of the city of Manchester, work as a bootblack, or sell or expose for sale, any newspapers, books, pamphlets or magazines, unless there shall first have been issued to him a badge, as hereinafter provided, nor unless he shall comply with the terms under which such badge shall be issued.

"Sect. 2. The superintendent of schools shall issue all badges in accordance with the provisions of this ordinance. He shall issue no badge except upon the application of the parent or guardian or of some responsible citizen of the city of Manchester if the applicant is under fourteen years of age. Upon receipt of the said application properly executed, the said superintendent of schools shall thereupon issue a badge and he shall further keep a record showing the name and age of the applicant and the date of issuing, and he shall retain properly filed, all documents necessary to support the said record. Such badge shall be of a suitable design approved by the board of mayor and aldermen and shall be issued annually on the second day of January and the applicant shall pay a fee of fifty cents for the same, to be returned upon surrender of the badge.

"Sect. 3. The said applicant shall conform to the laws of the state of New Hampshire, the ordinances of the city of Manchester, and the regulations of the board of mayor and aldermen of said city; he shall surrender his badge to the superintendent of schools when notified that his license has been revoked; shall not transfer nor loan his badge nor furnish any unlicensed persons with newspapers or the like; shall not, unless at least fourteen years of age, sell newspapers or the like after nine o'clock in the evening except on days of national, state and city elections; shall not at any time while so working or selling fail to wear conspicuously in sight the badge issued to him as aforesaid.

"Sect. 4. Any person who violates any of the aforesaid regulations may have his license revoked by the board of mayor and aldermen upon the complaint of any citizen or public officer and be subject to a fine of not less than one dollar nor more than five dollars for each offense."

The plaintiffs carried on without ever applying for the badges specified in the ordinance. As to this the complaint avers: "That plaintiffs and others of Jehovah's witnesses cannot and will not stop said lawful work and cannot and will not apply for a badge or a permit as required by said ordinance because for them to do so would be as they sincerely believe, an insult to Almighty God, Jehovah, and a violation of His supreme law and which would result in their everlasting destruction."

Equitable jurisdiction is invoked upon the allegation that the defendants have brought repeated criminal prosecutions against the various individual plaintiffs for violation of the invalid ordinance; that plaintiffs have been repeatedly convicted by the municipal court and have been compelled to perfect appeals to the Superior Court; that by reason of said prosecutions and threats of prosecution for future violations the plaintiffs have been frustrated in their right to distribute the various publications of the Society on the streets of Manchester; that the plaintiffs will suffer irreparable injury and damage unless continued enforcement of the ordinance by the defendants is enjoined.

■ Jurisdiction in the federal district court is alleged to rest on Section 24(1) of the Judicial Code, 28 U.S.C.A. § 41(1), in that the suit arises under the Constitution and laws of the United States, and the matter in controversy "exceeds as to all said 'natural person' plaintiffs jointly the sum of Three Thousand ($3,000.00) Dollars, exclusive of interest and costs." The record is barren of any showing that as to each individual plaintiff the matter in controversy exceeds the sum of $3,000; and

it is settled that "the plaintiffs may not aggregate their interests in order to attain the amount necessary to give jurisdiction." Hague v. C.I.O., 307 U.S. 496, 508, 59 S.Ct. 954, 960, 83 L.Ed. 1423, and cases cited. Jurisdiction is also said to rest on Section 24(14) of the Judicial Code, 28 U.S.C.A. § 41(14),[1] irrespective of the amount in controversy in that the suit is to redress the deprivation, under color of a city ordinance, of civil rights secured by the Constitution of the United States. There has been long-standing doubt as to the meaning in Section 24(14) of the phrase "right, privilege, or immunity, secured by the Constitution of the United States." See Note, 52 Harv.L.Rev. 1136-1142. This doubt was not altogether dispelled by Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, in which none of the opinions rendered received the assent of a majority of the justices. In Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493, the court's opinion was silent on jurisdiction and disposed of the case on the merits, though the District Court had been much puzzled as to the basis of federal jurisdiction. See Gobitis v. Minersville School Dist., 21 F.Supp. 581, 586, 588; Id., 24 F.Supp. 271, 274, 275. Until advised by the Supreme Court to the contrary, the best we can do, in the circumstances, is to follow the jurisdictional view set forth in the opinion in the Hague case which commanded the assent of the greater number of justices, that of Mr. Justice Stone. Accordingly, we hold that freedom of speech, of the press, and of religion are rights "secured by the Constitution of the United States" within the meaning of Section 24(14); and that under Section 24(14) the District Court had jurisdiction of the present suit, which is of the sort described in the Civil Rights Act, 8 U.S. C.A. § 43.[2]

No temporary injunction was issued. After hearing on the merits the court decreed that the complaint be dismissed as to the corporate plaintiff. We are not concerned with this, since no appeal has been taken by the Society.

The district judge expressed the view that the ordinance prescribed reasonable police regulations with reference to the use of the streets. Nevertheless, he felt constrained by Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949, to declare the ordinance invalid on its face; and he issued a permanent injunction restraining the defendants "from henceforth enforcing, or attempting to enforce, the said ordinance of the said City of Manchester." The breadth of the decree is to be noted. It does not merely enjoin enforcement as against the individual plaintiffs, but under the terms of the decree the defendants can take no action against bootblacks plying their trade on the city streets without having obtained the requisite badge, nor against children under fourteen years of age selling newspapers on the streets without an application for the permit having been made by their parents or guardians.

The challenged ordinance is modest in scope. It puts no restriction upon the giving away of books, papers, magazines, etc., at any time and at any place. Persons desiring to "sell or expose for sale" such literature on the streets or other public places are required to identify themselves before a designated official who keeps a record of the name and age of the applicant. For a nominal deposit a badge is issued to the applicant, who must wear the same conspicuously while selling on

[1] "Section 41. Original jurisdiction. The district courts shall have original jurisdiction as follows: * * *

"(14) Suits to redress deprivation of civil rights. [Fourteenth.] Of all suits at law or in equity authorized by law to be brought by any person to redress the deprivation, under color of any law, statute, ordinance, regulation, custom, or usage, of any State, of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law of the United States providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States."

See also 8 U.S.C.A. § 43 (derived from the Civil Rights Act of April 20, 1871, 17 Stat. 13, as reenacted with modifications in R.S. § 1979):

"Civil action for deprivation of rights. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[2] Quoted in footnote 1.

the streets, so that citizens and police may readily see that the seller has complied with the ordinance. It is provided that this deposit is to be returned upon surrender of the badge. As we read the ordinance the superintendent of schools has no function to pass on the character of the literature which the applicant proposes to expose for sale; nor has he any discretion to grant or withhold the license. On the contrary, it is his simple duty to issue the badge upon receipt of the application "properly executed". Aside from the regulations applicable to children under fourteen, all that the ordinance does is to enable the city to keep track of persons selling literature on the streets.

■ If, conceivably, the ordinance might be given an interpretation of broader sweep and more doubtful constitutionality, the notable and altogether proper reluctance of federal courts to issue injunctions against state and city officials, restraining their enforcement of criminal laws and ordinances, would lead us to adopt the most innocent interpretation until the state courts have ruled otherwise, or at least until the local officials have proceeded to act on an interpretation which brings the law or ordinance in conflict with constitutional guarantees. On the record now before us there is no indication that the superintendent of schools conceives it to be his duty to exercise any censorship over the literature which the applicant wishes to sell on the streets; and no state court has ruled that this official has any discretion to give or withhold the badge according as he may deem the literature proper or improper for public dissemination.

■ In our opinion the ordinance cannot be held void on its face under Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949, nor under any other controlling authority. The whole point of the Lovell case was that the practice of distributing literature of any kind, whether by sale or gratuitously, and not merely in the streets but anywhere within the city limits, was absolutely prohibited without the written permission of the city manager having first been obtained. This official, in exercising his discretion to give or withhold permission, was not even bound by any defined standards. The Supreme Court characterized the ordinance as restoring "the system of license and censorship in its baldest form" (page 452 of 303 U.S.,

page 669 of 58 S.Ct., 82 L.Ed. 949), and held that it infringed the freedom of the press protected by the Fourteenth Amendment.

The other cases are likewise distinguishable. In Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 964, 83 L.Ed. 1423, two ordinances were held invalid. One absolutely prohibited the distribution of circulars and hand bills in any public place. The other forbade assemblies in streets, parks and other public places without a permit from the director of public safety; and thus became an "instrument of arbitrary suppression of free expression of views". Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155, held invalid three ordinances absolutely prohibiting the distribution of hand bills or other printed matter on the public streets. Further, the court struck down another ordinance which it described as follows (pages 163, 164 of 308 U.S., page 152 of 60 S.Ct., 84 L.Ed. 155):

"It bans unlicensed communication of any views or the advocacy of any cause from door to door, and permits canvassing only subject to the power of a police officer to determine, as a censor, what literature may be distributed from house to house and who may distribute it. The applicant must submit to that officer's judgment evidence as to his good character and as to the absence of fraud in the 'project' he proposes to promote or the literature he intends to distribute, and must undergo a burdensome and inquisitorial examination, including photographing and fingerprinting. In the end, his liberty to communicate with the residents of the town at their homes depends upon the exercise of the officer's discretion."

Administrative censorship was also the vice in the statute invalidated in Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 902, 84 L.Ed. 1213, 128 A.L.R. 1352. There the statute forbade any person to solicit money or any valuable thing for any alleged religious cause "unless such cause shall have been approved by the secretary of the public welfare council." As the court said (page 305 of 310 U.S., page 904 of 60 S.Ct., 84 L.Ed. 1213, 128 A.L.R. 1352), if this official "finds that the cause is not that of religion, to solicit for it becomes a crime. He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of facts, the exercise of judgment, and the

formation of an opinion. He is authorized to withhold his approval if he determines that the cause is not a religious one. Such a censorship of religion as the means of determining its right to survive is a denial of liberty protected by the First Amendment and included in the liberty which is within the protection of the Fourteenth."

By contrast the Manchester ordinance now before us contains no element of prior censorship upon the distribution of literature. It requires only a simple routine act of obtaining a badge of identification before a person can sell on the streets. This reasonable police regulation, in our opinion, imposes no substantial burden upon the freedom of the press or the free exercise of religion.

No doubt, as in the case of any regulatory law, there is the possibility (though the record indicates no likelihood of it) that officials might act arbitrarily and in excess of their rightful powers in administering the ordinance. The superintendent of schools might arbitrarily withhold licenses from Jehovah's witnesses, despite his mandatory duty to issue the badges upon receipt of applications "properly executed." A license once given might be revoked upon some trumped-up pretext. By Section 3, the badgeholder is required to conform to the ordinances of the city and the regulations of the board of mayor and aldermen; some outrageous regulation might be issued, and for non-compliance with it a license might be revoked under Section 4. What the legal situation would be if any of these or other possibilities came to pass need not be examined now. It suffices to say that recognition of such possibilities does not render the ordinance void on its face, nor justify an injunction at the behest of persons who have failed to take the simple step of applying for a badge—a badge which, so far as the record indicates, would have been issued out of hand, as a matter of routine ministerial duty.

■■ The mandate of Jehovah to teach and preach the gospel is interpreted by the plaintiffs as a command, upon pain of everlasting destruction, to sell the gospel message on the streets of Manchester at five cents a copy without applying for the badge or permit required by the ordinance. From the plaintiffs' point of view they face a painful dilemma in this conflict between the call of conscience and the demands of man-made law. The possibility of such a conflict is, for the most part, fortunately eliminated by the guarantees of the First and Fourteenth Amendments. But not altogether. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244; Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637; Hamilton v. Regents, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343; Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493. See Coleman v. City of Griffin, 302 U.S. 636, 58 S.Ct. 23, 82 L.Ed. 495. The civil authority can never concede the extreme claim that police regulations of general application not directed against any sect or creed—however widely the regulations may be accepted as being reasonable and proper— are constitutionally inapplicable to persons who sincerely believe the observance of them to be "an insult to Almighty God." See Cardozo, J., in Hamilton v. Regents, 293 U.S. 245, 268, 55 S.Ct. 197, 79 L.Ed. 343.

■ Under the National Prohibition Act, 27 U.S.C.A. § 1 et seq., the use of sacramental wine was subject to regulation and permit. See Shapiro v. Lyle, D.C., 30 F.2d 971. The regulations were no doubt applicable even to persons who might have believed it a gross impiety to apply for a civil permit before partaking of a divine sacrament. Similarly, as to the sacrament of marriage—one must get a marriage license from the civil authority, and in some states a brief waiting period is mandatory after the license is issued. These may be regarded as instances of rendering unto Caesar the things which are Caesar's; certainly no insult to the Almighty is implied. The permit required by the Manchester ordinance is of a similar sort. As the court said in the Cantwell case, supra, 310 U.S. at page 306, 60 S.Ct. at page 904, 84 L.Ed. 1213, 128 A.L.R. 1352, "Even the exercise of religion may be at some slight inconvenience in order that the state may protect its citizens from injury. Without doubt a state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent."

The decree of the District Court is reversed, with costs to the appellants, and the case is remanded to that court with directions to dismiss the complaint.