**Hi HOLDRIDGE, a/k/a Hiram Holdridge, Larry Shumm and Neil Delmar Haworth, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 16380.**

United States Court of Appeals
Eighth Circuit.

Aug. 31, 1960.

Francis Heisler, Carmel, Cal., for appellants.

Ronald D. Raitt, Asst. U. S. Atty., Omaha, Neb., for appellee.

Before SANBORN, MATTHES and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

Two Informations charged these three appellants with violating Title 18 U.S.C. § 1382 [1] in that they re-entered and were found within Mead Ordnance Depot, Mead, Nebraska, a military reservation, after having been removed from it and ordered not to re-enter.[2] The cases were consolidated for trial. The jury found the defendants guilty and each received a fine and sentence.

It appears without controversy that the property in question was a military reservation enclosed, partially at least, by a fence, and with an East Gate and a North Gate; that Holdridge and Shumm on July 10, 1959, were warned by the military authorities that it was federal property under the jurisdiction of the Air Force and that they were not to enter; that nevertheless they crossed the fence on that day; that each was then given a writing which bore his name and stated that he was "being removed as a trespasser * * * and ordered not to re-enter" without appropriate permission; that each was removed without difficulty; that each immediately effected re-entry by crossing the fence again; and that the same warning, entry, removal and written notice and order took place on July 16, 1959, with respect to defendant Haworth.

Holdridge, 19 years of age at the time of the trial, is the son of a Methodist minister, was prominent in activities of his local church, and had undertaken some studies in preparation for the ministry. Shumm, also 19, had completed his freshman year in college and is one who, as he testified, felt the entry "was necessary and that our convictions led us to do it". Haworth, a "birthright Quaker", is a college graduate and active in church and peace organizations.

During the trial the defense, upon objection, was not permitted to introduce evidence concerning the purpose of the defendants' re-entry. There separate offers of proof were made. These proposed

---

1. § 1382 reads in full:
 "Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or
 "Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—
 "Shall be fined not more than $500 or imprisoned not more than six months, or both."

2. The only count of the amended Information against defendants Holdridge and Shumm reads:
 "That on or about July 10, 1959, Hi Holdridge, a/k/a Hiram Holdridge, and Larry Shumm did unlawfully and wilfully within the jurisdiction of the United States and in the District of Nebraska re-enter and were found within a military reservation, to wit, a certain area of the Mead Ordnance Depot, a/k/a Nebraska Ordnance Plant, a/k/a Missile Site 'A', a/k/a Missile Site '1', Mead, Nebraska, after the said Hi Holdridge and Larry Shumm, having been removed therefrom and ordered not to re-enter by an officer and person in command, and in charge of said military reservation.
 "In violation of Title 18, United States Code, Section 1382."
 The amended Information against defendant Haworth and another is identical except that the date of the offense charged is July 16, 1959.

evidence showing in substance that the defendants as individuals were trained and believed in a peaceful life; that they are religiously motivated persons who are against violence; that they are opposed to war and preparation for war; that, because of such motivation, they felt compelled to bring their thoughts of the immorality of war, and in particular of nuclear war, to the attention of the military authorities and of those persons engaged in building the missile base in the hope that they might be persuaded to cease its construction; that, if called upon, they would claim exemption from military service as conscientious objectors; that thermonuclear explosions are harmful to all people of the world; and that it was not their intent to trespass but to exercise their rights to ascertain whether this government property was being used constitutionally and legally.

On this appeal the defense claims: (1) lack of proof of venue; (2) lack of proof of the government's exclusive right of possession of the site; (3) the government's intended nuclear and therefore improper use of the site, and the right of the defendants as citizens and as persons in the posture of cestuis que trustent to prevent such use; (4) materiality of the defendants' motives and purposes in effecting re-entry; (5) violation of the freedoms of speech, religion and assembly guaranteed by the First Amendment; and (6) errors with respect to instructions.

 *Venue.* Article III, Section 2, of the United States Constitution provides that the trial of a crime "shall be held in the State where * * * committed". The Sixth Amendment guarantees an accused "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." Correct venue in criminal cases, therefore, is a matter of constitutional right and questions of venue "are not merely matters of formal legal procedure" but raise "deep issues of public policy". United States v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236; United States v. Cores, 356 U.S. 405, 407, 78 S.Ct. 875, 2 L.Ed.2d 873; Rule 18, Fed. Rules Crim.Proc., 18 U.S.C. Accordingly, it has been held by this court and others that venue, unless properly waived, is an essential part of the government's case in a criminal prosecution and must be established by adequate proof the burden of which is on the government.[3] However, venue need not be proved by direct evidence. It may be established, as any other fact, by the evidence as a whole or by circumstantial evidence.[4] This court has even said that it is not an integral part of a criminal offense and thus need not be proved beyond a reasonable doubt. Dean v. United States, 8 Cir., 246 F.2d 335, 338; see Blair v. United States, 8 Cir., 32 F.2d 130, 132. Thus, while there are some cases where failure to connect named streets with a particular city has been held to constitute a lack of necessary proof of venue,[5] the courts in other street cases have held that on the record as a whole a jury could properly find that venue has been established.[6] This result

---

3. Brightman v. United States, 8 Cir., 7 F.2d 532, 534; Cain v. United States, 8 Cir., 12 F.2d 580, 582; Morehouse v. United States, 8 Cir., 96 F.2d 468, 470; Vernon v. United States, 8 Cir., 146 F. 121, 126; United States v. Gross, 2 Cir., 276 F.2d 816, 818–819; United States v. Jones, 7 Cir., 174 F.2d 746, 748; Moran v. United States, 6 Cir., 264 F. 768, 770.

4. Dean v. United States, 8 Cir., 246 F.2d 335, 337–338; Blair v. United States, 8 Cir., 32 F.2d 130, 132; United States v. Karavias, 7 Cir., 170 F.2d 968, 970;

United States v. Jones, supra, at page 749 of 174 F.2d; Sandroff v. United States, 6 Cir., 174 F.2d 1014, 1018, certiorari denied 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584; White v. United States, 83 U.S.App.D.C. 174, 167 F.2d 747.

5. United States v. Jones, supra, at page 749 of 174 F.2d; see Jianole v. United States, 8 Cir., 299 F. 496, 498–499.

6. Dean v. United States, supra; George v. United States, 75 U.S.App.D.C. 197, 125 F.2d 559, 564; Wallace v. United States, 7 Cir., 243 F. 300, 306; United States v. Karavias, supra.

has been reached, in particular, where an adequate and informative map has been employed and identified and the situs of the alleged crime has been connected with it. Morehouse v. United States, 8 Cir., 96 F.2d 468, 469–470, and Blair v. United States, supra, where this court said, at page 132 of 32 F.2d:

> "Venue * * * may be shown by indicating, or pointing out the locus in quo, on a map identified as a correct map of a county, or of any particular section of the trial court's jurisdiction".

We hold that the objection here as to venue is not well taken. While the Informations, of course, are not evidence, the charges they embrace clearly fix the claimed incursions on military property at Mead, Nebraska. Inasmuch as the entire State of Nebraska constitutes one judicial district, 28 U.S.C.A. § 107, there is thus no question as to the proper allegation of venue in each Information. The matter then becomes one of proof. Government's Exhibit 2, which was admitted in evidence without objection, asserts, in so many words, that it is a "Project Ownership" type of map for Saunders County, Nebraska, and that the "Location of the Project" is 9 miles southeast of Wahoo. It refers to the "Nebraska Ordnance Plant Military Reservation" and contains a small but unmistakable outline of the State of Nebraska, with Omaha and Lincoln located and with the "Project Site" clearly placed within the confines of the State. It also contains a plat of a number of sections but this portion makes no mention of the state. In addition, there is on the exhibit a smaller scale "Vicinity Map" showing certain counties, townships and ranges, the cities of Omaha and Lincoln, and the Project Site, west and a little south of Omaha, in Saunders County. This exhibit plus the testimony of the Chief of the Real Estate Division, U. S. Army Engineers at Omaha, that he was familiar with the property known as the Nebraska Ordnance Plant or Mead Ordnance Depot at Mead, Nebraska; plus

Government's Exhibit 1, duly admitted, consisting of Nebraska federal court condemnation judgments for real estate located in Saunders County, Nebraska; plus connection by the same witness of Section 8 and the North Half of Section 17, Township 14 North, Range 9 East, Saunders County, Nebraska, as constituting the missile site in question, viz., "certain properties on the Nebraska Ordnance Plant", transferred "to the Department of the Air Force for a period of five years beginning 27 January, 1959", and as covered, in part at least, together with other property, by the judgments constituting Exhibit 1, and his identification of Exhibit 2 with the same property; plus the testimony of the Executive Officer, Offutt Air Force Base, Nebraska, identifying the location of the missile site on Mead Ordnance Plant as a shaded area on Exhibit 2; plus the testimony of the Provost Marshal as to his post on the missile site at Mead, Nebraska, on the days of the claimed offenses; plus the testimony of two Air Force Officers as to their presence at the missile site "at Mead" and "at Mead, Nebraska", respectively, on the days in question, all make it abundantly clear that Nebraska venue was given adequate evidentiary support. This case presents facts just as strong as those of the Dean, Morehouse and Blair cases, supra, where venue had been upheld by this court in the face of challenge and where, in the two cases last cited, map technique of the kind employed here was present.

*Exclusive possession of the property.* This argument rests upon the fact that prior to the federal condemnations certain county roads traversed what later became the missile site. The points made by the defense are (a) that there is no proof that the public right to use these roads was taken over in the condemnation proceedings and (b) that the place of entry was at the so-called East Gate placed across one of these roads. The government, in response, asserts that the public use was abolished and that in any event the entries made by the defendants were not through the

gate but were over the fence at points not on the road.

The condemnation proceedings here involved made use of what is now 40 U.S. C.A. § 258a to 258e, which authorizes the taking of possession and title in advance of final judgment. § 258a requires that the government's declaration of taking contain, among other things, "a statement of the estate or interest in said lands taken for said public use". Each of the several Judgments on Declaration of Taking comprising Exhibit 1 finds as a fact that the statement as to the estate taken was included in the declaration. One of the judgments recites that "it is ordered, adjudged and decreed that the title to the said land in fee simple absolute * * * vested in the United States of America * * * and that said land is deemed to be condemned and taken for the United States of America * * *". That judgment permitted tenants to remain in possession "of the homes and other outbuildings" for a very limited time "with right of egress and ingress to said homesteads", but granted no other right of entry. The other judgments contained essentially identical provisions.

Ordinarily, where unlimited use is contemplated, condemnation abrogates and extinguishes all preexisting interests in the property. United States v. Gossler, D.C.D.Or., 60 F.Supp. 971, 973.

> "Ordinarily an unqualified taking in fee by eminent domain takes all interests and as it takes the *res* is not called upon to specify the interests that happen to exist. Whether or not for some purposes the new takers may be given the benefit of privity with the former holders, the accurate view would seem to be that such an exercise of eminent domain founds a new title and extinguishes all previous rights." Duckett & Co. v. United States, 266 U.S. 149, 151, 45 S.Ct. 38, 69 L.Ed. 216.

To the same effect are United States v. Sunset Cemetery Co., 7 Cir., 132 F.2d 163, 164–165; Meadows v. United States, 4 Cir., 144 F.2d 751, 753; Burkhart v. United States, 9 Cir., 227 F.2d 659, 661–662; Silberman v. United States, 1 Cir., 131 F.2d 715, 717; United States v. 4.105 Acres of Land, etc., D.C.N.D.Calif., 68 F.Supp. 279, 290. If anything less than the absolute fee is to be taken, it must be carved out in the declaration or be clearly inferable. Burkhart v. United States, supra, at page 661 of 227 F.2d. Thus, in the Sunset Cemetery Co., Gossler and Burkhart cases highway purpose easements were specifically preserved from the taking by appropriate language in both the petition for condemnation and in the declaration of taking.

The defense cites United States v. Watson, D.C.E.D.Va., 80 F.Supp. 649, as authority for the proposition that the government's taking does not support a conclusion that the public's right of user in the roads is dissolved. That case, however, is to be distinguished. Three of the counts there involved charged the defendant with a violation of § 1382. The premises involved were known as the Fuller Road. This was a road extending from U. S. Highway No. 1 for several miles to the town of Quantico, Virginia. The United States first established the Marine Corps Barracks at Quantico under a lease in 1917 and then in 1918 by appropriate steps acquired the fee to the reservation. The lands so acquired embraced the road. The court in trying the case without a jury held that the United States had acquired the fee simple title to that part of the road within the reservation and thereby became vested with the exclusive criminal jurisdiction over it. However, with respect to § 1382 it said, at page 651 of 80 F. Supp.:

> "The Court is of the opinion that the United States must show an absolute ownership, or an exclusive right to the possession, of the road, in order to enforce the commandant's interdiction of the defendant. To punish an infraction of the order, as an offense under title 18, section 1382, U.S.C.A., proof of criminal jurisdiction of the road alone was

not enough. Sole ownership or possession, as against the accused, had to be in the United States or there was no trespass."

The defendant was then found not guilty on the 3 counts. The court reached this conclusion by noting that the town was squeezed between the river and the reservation, that except for the Fuller Road it was cut off from U. S. 1 and the rest of Virginia, that the public continued to use the road, and that neither the state nor the county was impleaded in the condemnation proceedings, and concluded that the United States acquired and held the road subject to the public thoroughfare or the right of ingress and egress in favor of property located in Quantico and that in taking the land the United States "contemplated no more exclusive user of the road". While the 1918 condemnation proceedings there may not have expressly excluded the highway rights, the court's finding as to governmental intent must equate with such an exclusion and does not stand generally for the opposing proposition that a fee simple condemnation carries with it no highway rights unless specified. We regard the Watson case as not out of line with those espousing the general rule cited above. We find nothing in the case before us, moreover, which would warrant a holding that the government by its condemnation proceedings here took anything less than the entire fee including any highway right which may have existed in what formerly were county roads now embraced within the boundaries of the missile site.

We therefore hold that exclusive possession of the premises in the government has been appropriately established. This conclusion makes it unnecessary to consider the government's alternative argument that the facts show the entries to have been made at places apart from the road.

■ *Nuclear use.* The claim here is that provision for the common defense, referred to in the Preamble of the Constitution, is not a source of power for the federal government; that the Pre-amble merely shows that the Constitution emanated from the people; that the government cannot use property unless it promotes the "general welfare"; that the establishment of the missile base is adverse to the general welfare; that the power to build bases for nuclear facilities with consequent radioactive fallout is a power reserved under the Tenth Amendment to the states; and that fallout is harmful and dangerous to human beings. This argument finds its conclusive answer, we think, in the first clause of Article 1, Section 8, of the Constitution relating to the common defense, and we need add nothing to what has been said recently in Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252, 254:

> "The relief here sought is to stop actions of the Executive which Congress has explicitly authorized. The power of Congress to provide for the common defense, and the duty of the Executive to see to it that the laws are faithfully executed, like the exclusive power of the Executive relating to foreign policy, are within the historic areas of political power in which actions of the Executive and Legislative Branches are supreme and beyond judicial review. The acts and powers challenged here are plainly authorized by law and are not prohibited by the Constitution."

*Motive as a defense.* Few cases involving § 1382 have reached appellate stage and, so far as we know, none has involved the question of criminal intent as a necessary factor in the crime defined by this statute. The matter thus is one of first impression here.

■ It is to be noted that § 1382 is divided into two parts or paragraphs. The first is directed to *entry* upon the military reservation "for any purpose prohibited by law or lawful regulation". Then comes the disjunctive "or" followed by that paragraph under which the present charges are brought. This second paragraph is directed to re-entry after removal or after appropriate order not to re-enter. This paragraph thus in-

volves a *second* invasion of the premises and one where the accused, because of his prior physical removal or the formal order, is definitely aware that re-entry is prohibited.

While the point is not now before us, it seems clear enough, from the use of the words "for any purpose prohibited" in the first paragraph of the section, that motive to some extent at least is an element of the offense there defined. Purpose and the prohibition must both be proved. This interpretation affords some protection to the innocent trespasser. The section's second paragraph, however, contains no words of purpose or motive. The question is thus raised as to whether there is absolute liability for the act even though the motive may be innocent and not one involving, as the cases variously call it, criminal intent, malice aforethought, wilfulness, scienter, mens rea, and the like.

This kind of question is not new. The Supreme Court has discussed it with respect to other statutes. Its most recent case is Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, which involved a prosecution under 18 U.S.C. § 641 relating to "Whoever * * knowingly converts" government property. The defense was that the accused believed that the property was abandoned and that he took it with no criminal intent. The Court indulged in a revealing historical approach and observed that at the common law intent, with few exceptions, was a necessary element in crime, that the intent and the act were both necessary, and that crime, "as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand * * * took deep and early root in American soil". The Court observed, however, that there is a class of criminal offenses, theretofore recognized and approved by it, where motive or criminal intent is not a factor in the crime. United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604; United States v. Behrman, 258 U.S. 280, 288, 42 S.Ct. 303, 66 L.Ed. 619, and United States v. Dotterweich,

320 U.S. 277, 280–281, 284, 64 S.Ct. 134, 88 L.Ed. 48, involving prosecutions under narcotics and food and drug acts, provide instances of this kind of legislation. The Court in Morissette stated, at pages 252, 255 of 342 U.S., at pages 244, 246 of 72 S.Ct., that these "belong to a category of another character, with very different antecedents and origins" and that these cases "do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property or public morals". It said, at pages 255–256, 262 of 342 U.S., at pages 246, 249 of 72 S.Ct.:

"Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necesary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations,

**310**

courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime. This has not, however, been without expressions of misgiving. * * *

" * * * Congressional silence as to mental elements in an Act merely adopting into federal statutory law a concept of crime already so well defined in common law and statutory interpretation by the states may warrant quite contrary inferences than the same silence in creating an offense new to general law, for whose definition the courts have no guidance except the Act."

See also Smith v. People of State of California, 361 U.S. 147, 152, 162, 80 S.Ct. 215, 4 L.Ed.2d 205.

■ From these cases emerges the proposition that where a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause. Shevlin-Carpenter Co. v. State of Minnesota, 218 U.S. 57, 69-70, 30 S.Ct. 663, 54 L.Ed. 930; United States v. Balint, supra, page 252 of 258 U.S., at page 302 of 42 S.Ct.; Williams v. State of North Carolina, 325 U.S. 226, 238, 65 S.Ct. 1092, 89 L.Ed. 1577.

■ It is not difficult to apply these standards to § 1382. Trespass, unaccompanied by or not tending to create a breach of the peace does not appear to have been a crime at common law. 87 C.J.S. Trespass § 140; 52 Am.Jur., Trespass, § 84; Hopewell Tp. v. Gru-

chowski, 29 N.J.Super. 605, 103 A.2d 177, 178. But even if trespass as a crime did have some recognition in the common law and if one concedes that § 1382 rests on a trespass concept, this takes us no further, logically, than the section's first paragraph. There initial trespass is involved and there a prohibited purpose must be present. We are not aware, however, that a repeated trespass or a re-entry, tied in with prior physical removal or specific command not to re-enter, has criminal roots in the common law. Cf. Levine v. United States, 104 U.S.App.D.C. 281, 261 F.2d 747. Consequently the second paragraph of § 1382 does not fall within the Supreme Court's observation relative to statutes derived from common law crimes. Furthermore, we are dealing here with a statute affecting military property and concerning national defense. It seems thus to satisfy the policy element mentioned in the cases. Also, comparatively, the penalty is small and conviction does not so gravely damage the offender's reputation. It is a statute of prohibition rather than of punishment. All the standards of the cited cases are met.

■ We therefore regard § 1382's second paragraph as falling into that category where, like the statutes involved in Balint and Behrman and Dotterweich, intent may properly be omitted as an element of the offense. We hold that it is omitted in that paragraph and that such omission does not render the statute invalid. It follows that there was no error in the trial court's rulings denying admission of evidence of the kind suggested by the offers of proof.

The defense, however, presses upon us the cases of Keegan v. United States, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745, and Kiyoshi Okamoto v. United States, 10 Cir., 152 F.2d 905, and in particular the following quotation (at pages 493-494 of 325 U.S., at pages 1209-1210 of 65 S.Ct.) from the primary but not majority opinion in Keegan and quoted in Okamoto (at page 908 of 152 F.2d):

"One with innocent motives, who honestly believes a law is unconstitutional and, therefore, not obligatory, may well counsel that the law shall not be obeyed; that its command shall be resisted until a court shall have held it valid, but this is not knowingly counselling, stealthily and by guile, to evade its command."

The defendants in those two cases were charged with conspiracy to counsel others to evade service in the armed forces in violation of the Selective Training and Service Act of 1940. The significance of the quotation, as is evident from its language, lies in the conspiratorial aspect of the defendants' conduct. It has been said that a corrupt motive is an essential element in criminal conspiracy. Cruz v. United States, 10 Cir., 106 F.2d 828, 830. Innocence of motive, three justices then said, has a significance.

The case before us does not involve a charge of conspiratorial activity. We have just held that intent or motive is not a component of the offense charged under the second paragraph of § 1382. Consequently, Keegan and Okamoto and the quotation therefrom are not controlling here. The counselling of the testing of the validity of a statute, under certain circumstances, may not in and of itself be wrong, as these two cases suggest, but it is still true that one who tests a criminal statute assumes whatever consequences flow from his act. Warren v. United States, 10 Cir., 177 F.2d 596, 600, certiorari denied 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584. He is not like the dog with his proverbial first bite. If he prevails in his challenge all is well but if he fails he must abide by the result.

■ *First Amendment rights.* The defense suggests the Constitution's guarantees of freedom of religion, speech and assembly. While these are fundamental rights, it is well settled that they are not absolute in all their aspects. Cantwell v. State of Connecticut, 310 U.S. 296, 303–304, 308, 60 S.Ct. 900, 84 L.Ed. 1213; Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed.

470; DeJonge v. State of Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278; United Public Workers etc. v. Mitchell, 330 U.S. 75, 95, 67 S.Ct. 556, 91 L.Ed. 754; Gara v. United States, 6 Cir., 178 F.2d 38, 40, affirmed 340 U.S. 857, 71 S. Ct. 87, 95 L.Ed. 628; Kiyoshi Okamoto v. United States, supra, at page 907 of 152 F.2d. Moreover, the doing of an act motivated by religious belief or thought to be a proper exercise of free speech does not necessarily preclude criminal liability. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244; Gilbert v. State of Minnesota, 254 U.S. 325, 41 S.Ct. 125, 65 L.Ed. 287; City of Manchester v. Leiby, 1 Cir., 117 F.2d 661, 666, certiorari denied 313 U.S. 562, 61 S.Ct. 838, 85 L.Ed. 1522. The 4th Circuit has aptly said, in Baxley v. United States, 134 F.2d 937, 938:

"Even clearer is it that one is criminally responsible who does an act which is prohibited by a valid criminal statute, though the one who does this act may do it under a deep and sincere religious belief that the doing of the act was not only his right but also his duty."

We find no violation of First Amendment guaranties here.

■ *Instructions.* What we have said above dispenses with most of the objections raised by the defense with respect to the trial court's instructions to the jury. An additional one, that of the use of an "Allen" type of charge (see Allen v. United States, 164 U.S. 492, 501–502, 17 S.Ct. 154, 41 L.Ed. 528) in the court's original, as distinguished from supplemental, instructions is governed by what has been said in Janko v. United States, 8 Cir., 281 F.2d 156, 167–8, and Nick v. United States, 8 Cir., 122 F.2d 660, 674, certiorari denied 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550, and needs no additional comment. Another, bottomed upon the court's reading from each of the two Informations the reference to "a certain area of the Mead Ordnance Depot * * * Mead, Nebraska", is claimed to constitute undue emphasis of what is not evidence upon the issue of

venue; the court, however, carefully pointed out that his reading was "given solely for the purpose of informing you of the exact charges made against the several defendants". We find no error in respect to instructions.

The judgments are affirmed.