815 F.2d 706
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Melvin Thomas KLEIN, Defendant-Appellant.
 No. 86-3129.
 United States Court of Appeals, Sixth Circuit.
 March 3, 1987.
 
 Before WELLFORD and GUY, Circuit Judges, and, PECK, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Defendant, Klein, possessed numerous firearms, firearm parts, and ammunition subject to regulation under the National Firearms Act. After an investigation and execution of a search warrant of defendant's residence, he was arrested and indicted for seven counts of Firearms Act violations. Klein at first pled guilty, but withdrew his plea. Later, a superceding indictment, consisting of twelve counts of Firearms Act violations was returned. After entering a not guilty plea, Klein was convicted on eight counts of the indictment and was sentenced to three years on each count, to be served concurrently. We AFFIRM.
 
 
 2
 The issues on appeal are: (1) whether Klein has standing to challenge the constitutionality of the National Firearms Act, and (2) whether Klein was denied due process under the circumstances.
 
 
 3
 In March, 1985, the Bureau of Alcohol, Tobacco, and Firearms (ATF) began investigating sales of automatic weapons, silencers, and ammunition by one Wayne Shaw. Shaw's apparent supplier was Klein. ATF agents saw Shaw enter Klein's house empty-handed and shortly thereafter emerge carrying a brown paper bag. An agent, together with an informant, obtained an Uzi 9mm short-barreled rifle from this bag. Again the next month, ATF agents saw Shaw enter Klein's house and emerge with a brown paper bag. The bag contained a MAC-10, .45 caliber machine gun, a flash suppresser, and ammunition.
 
 
 4
 A U.S. Magistrate then issued a search warrant the next week and the ATF searched Klein's house.[1] The following items were confiscated: four fully assembled machine guns; two rifles altered to be automatic weapons; hundreds of machine gun parts, including enough components to make several complete guns; an unassembled Sten machine gun; hundreds of silencer parts, including enough components to make two 9mm silencers; about 230,000 rounds of live ammunition; 1200 pounds of spent brass cartridges and other reloading materials, and over 400 pounds of powder. The government agents also confiscated documents, diagrams, and specifications, in Klein's handwriting, for the manufacture of MAC-10 machine guns.
 
 
 5
 Klein was first indicted on seven counts of violating the National Firearms Act. After withdrawal of his guilty plea on a portion of the charges, a twelve-count indictment was returned by the grand jury, accusing Klein of additional firearms laws violations, including unlawful transfer of weapons and a silencer, possession of unregistered weapons and silencers, unlawful manufacture of machine gun, engaging in the business of manufacturing machine guns, silencers and ammunition, and unlawful storage of explosive materials.
 
 
 6
 At trial on a superceding indictment, Shaw, among others, testified for the prosecution. Klein testified in his own behalf and he denied providing Shaw with the rifle and silencer that Shaw furnished the undercover agent (and informer) on March 19, 1985. Klein admitted selling Shaw a semi-automatic weapon in April of 1985, but said that Shaw, not he, had converted it into an automatic weapon using equipment located in his basement. Previously, in an April 17, 1985, taped interview with government agents and counsel present, Klein admitted converting the weapon to an automatic at Shaw's request. Klein testified that he possessed the four fully assembled firearms found in the course of the April 24th search but claimed he had not attempted to fire these particular weapons and thus did not know if they were in fact operable. (He conceded on cross-examination that he knew the firearms were originally designed to function as fully automatic weapons.) Klein also acknowledged that he himself manufactured one of the firearms, the MAC-10, .45 caliber machine gun, and that he assembled the fully automatic version of the MAC 10 so that it would be representative of the military model. He admitted failing to put a serial number on it and failing to register it. He also confirmed that he prepared, in his own handwriting, instructions, diagrams, and specifications for the manufacture and assembly of MAC 10 machine guns, but he claimed these notes had been collecting over many years without any intent to act in violation of the Firearms Act.
 
 
 7
 With respect to the Uzi and Thompson rifles confiscated in the course of the April 24th search, Klein conceded that he had internally altered the receivers of the weapons so that they would accommodate certain parts designed for use in fully automatic weapons. While Klein did not dispute that the alteration of the receivers and the insertion of the fully automatic parts would enable the firearms to function as fully automatic weapons, he insisted the modifications were performed for "demonstration purposes" alone and that he had not test-fired the weapons to determine if in fact the modified firearms were capable of operating as fully automatic weapons. Klein's trial testimony appeared to contradict statements made during the April 17, 1985, interview, wherein he, in discussing the Uzi, indicated that he converted the firearm to automatic "[j]ust to shoot" it and that he had indeed "already shot the thing" and "knew [that] it worked."
 
 
 8
 In further trial testimony, Klein readily admitted possessing a large collection of what he knew to be internal parts for both .22 caliber and 9mm silencers. While Klein also admitted possessing various external silencer components, including certain tubes, Klein contended the tubes were approximately one inch short of the length required to assemble what he considered to be a complete silencer. Klein claimed that the silencers assembled and tested by the government firearms expert were incomplete as the devices did not contain all of the internal parts that might have been included in what the defendant considered to be a full-size firearms silencer.
 
 
 9
 At the close of the evidence, the defendant objected to certain jury instructions prepared by the district court, contending that the instructions and the interpretation of the National Firearms Act upon which the instructions were based offended the due process clause of the fifth amendment. Upon consideration of this contention, the district court overruled the objection, finding "no support for the position taken by the Defendant."
 
 
 10
 The government questions whether Klein has standing to attack the constitutionality of the felony provisions of the National Firearms Act on due process grounds. The government's argument is that a party has standing to challenge a statute's constitutionality only if the statute has an adverse impact upon his own rights. Ulster County Court v. Allen, 442 U.S. 140, 154-55 (1979). The government argues that if there is no constitutional defect in the application of the statute to a particular litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations. See United States v. Herrera, 584 F.2d 1137, 1148 (2d Cir.1978); Daulton v. United States, 474 F.2d 1248, 1249 (6th Cir.1973) ("Since the statute is constitutional as applied to the facts of this case, defendant-appellant has no standing to attack it on the ground that, as applied to other persons or in other situations, it might be unconstitutional.") (citation omitted).
 
 
 11
 Klein, it is claimed, is not personally affected by the constitutional defect he has alleged because he has not asserted that he was unaware of the fact that the weapons in his possession and now in controversy were subject to regulation under the Act. The government interprets Klein's constitutional attack to be an argument that due process is violated by the failure to require proof that the defendant was aware of the particular attributes of the weapon that rendered it a "firearm" within the meaning of the Firearms Act. Klein's trial testimony indicates that Klein was aware of particular attributes of the guns and ammunition involved.
 
 
 12
 Klein argues that "these felony provisions violate the Due Process Clause of the Fifth Amendment in that they subject a criminal defendant to substantial criminal penalties without requiring proof of scienter (i.e., knowledge by defendant of the particular attributes of the weapon involved which made it a 'firearm' under the statute)." Klein maintains that this "strict liability" standard, combined with substantial criminal sanctions, is "fundamentally unfair."
 
 
 13
 If the defendant possesses actual knowledge of the true character of the firearms in question, he cannot "be heard to object to the statute on behalf of" those who lack such knowledge. United States v. Mullens, 583 F.2d 134, 140 (5th Cir.1978); United States v. Raines, 362 U.S. 17, 21 (1960). We find that the defendant is not a member of the class of individuals personally aggrieved by the kind of constitutional infirmity herein alleged because he clearly lacks standing to advance the particular constitutional challenge he seeks to present. Essentially, Klein is merely challenging the statute's constitutionality on hypothetical grounds not pertinent to his status of one possessed of knowledge and understanding of the type and attributes of the weapons, silencers, and ammunition which he undeniably possessed, transferred, remade, and produced. Klein is not personally affected by the alleged constitutional infirmity, thus he lacks standing to attack the law.
 
 
 14
 The point of Klein's constitutional attack is that a person may not be punished who does not know "of the particular attributes of the weapon involved which made it a 'firearm' under the statute." There is no reasonable doubt, however, that Klein knew of the attributes of the automatic weapons in his possession and with which he dealt.[2] The constitutional objection he raises simply does not apply to his personal circumstances in this case. Klein, therefore, does not have standing to challenge the statute's constitutionality. There is a "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration", Ulster County Court, 442 U.S. at 154 (citing New York City Transit Authority v. Beazer, 440 U.S. 568, 582-83 (1979)); Daulton, 474 F.2d at 1249, we affirm Klein's convictions without addressing further his constitutional arguments.
 
 
 15
 Klein does not challenge the propriety of the court's scienter instructions, and he concedes that the government need not prove that he knew his conduct was illegal. See United States v. Freed, 401 U.S. 601, 607 (1971) (decision by Justice Douglas, concurrence by Justice Brennan). Klein also concedes that the government need not prove he knew the guns were not registered or that he knowingly failed to register them. Finally, Klein concedes that the government need not prove that he knew of the particular attributes of the weapons that made them regulated "firearms".
 
 
 16
 Under these circumstances, even if Klein had standing to pursue his constitutional claim, we believe his argument is foreclosed by the rationale of the Freed case.
 
 
 17
 Accordingly, we AFFIRM the judgment of conviction.
 
 
 18
 GUY, Circuit Judge, concurring.
 
 
 19
 I concur separately because I believe that defendant does have standing to challenge the constitutionality of the National Firearms Act, 26 U.S.C. Secs. 5861 and 5871. At the same time, because I find the Act, as construed, to satisfy constitutional standards, I would affirm.
 
 
 20
 The facts, as recited by the court, clearly indicate that defendant possesses knowledge of the particular attributes of the weapons involved which make them firearms within the meaning of the statute. Defendant concedes as much. The court therefore concludes that defendant does not have standing to challenge the statute because it lacks a scienter requirement. However, as I understand defendant's argument, he does not challenge the lack of a scienter requirement. Quite the contrary, defendant admits that the statute does not require scienter, and concedes that this construction is consistent with Congressional intent. What defendant does challenge is the penalty provision of the Act. He contends that, because no intent is required, the substantial criminal penalties which may be imposed under the felony provision of the Act render it unconstitutional.
 
 
 21
 In support of his argument, defendant relies on Morissette v. United States, 342 U.S. 246 (1952), where the court discussed the type and nature of laws which dispense with the mens rea element:
 
 
 22
 Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime. This has not, however, been without expressions of misgiving.
 
 
 23
 Id. at 255-56 (emphasis added).
 
 
 24
 This court relied on Morissette in United States v. Wulff, 758 F.2d 1121 (6th Cir.1985), where we considered the felony provisions of the Migratory Bird Treaty Act, 16 U.S.C. Sec. 703. Wulff was indicted based on a sale of a necklace made of red-tailed hawk and great-horned owl talons made to a special agent of the U.S. Fish and Wildlife Service. We also looked to Holdridge v. United States, 282 F.2d 302 (8th Cir.1960), where the court set forth the following test:
 
 
 25
 [W]here a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.
 
 
 26
 Id. at 310. Based on this test, we held that the elimination of the intent element does not violate the due process clause where (1) the penalty is relatively small, and (2) where conviction does not gravely besmirch. Because the felony penalty under the Migratory Bird Treaty Act carried a maximum sentence of two years imprisonment or a $2,000 fine, or both, the penalty was not small. Accordingly, we struck down the felony provisions of the statute.
 
 
 27
 The government contends that the question defendant raises here was decided adversely to him in United States v. Freed, 401 U.S. 601 (11970). In Freed, the Supreme Court considered whether the National Firearms Act required specific intent or knowledge that the weapons possessed were not registered in accordance with the Act. In upholding the law, the Court distinguished Lambert v. California, 355 U.S. 225 (1957), where the Los Angeles Municipal Code made it a crime for a person who had been convicted of a felony to remain in the city for more than five days without registering, stating, "[t]he mere failure to register ... was quite 'unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed.' " 355 U.S. at 228.
 
 
 28
 In contrast, the Court likened the National Firearms Act to the situation presented in United States v. Balint, 258 U.S. 250 (1922), where defendant was convicted of selling narcotics against his claim that he did not know the drugs were covered by a federal act. As Chief Justice Taft explained in Balint:
 
 
 29
 Its manifest purpose is to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute, and if he sells the inhibited drug in ignorance of its character, to penalize him. Congress weighed the possible injustice of subjecting an innocent seller to a penalty against the evil of exposing innocent purchasers to danger from the drug, and concluded that the latter was the result preferably to be avoided.
 
 
 30
 258 U.S. at 254-255. The Freed Court, in upholding the constitutionality of the National Firearms Act, recognized that the Act was a regulatory measure in the interest of public safety, premised on the theory that one in possession of dangerous weapons should not be surprised to learn that such possession is subject to regulation.
 
 
 31
 It is this last rationale which separates Wulff from both Freed and the instant case. As explained in United States v. International Minerals Corp., 402 U.S. 558 (1970):
 
 
 32
 In Balint the Court was dealing with drugs, in Freed with hand grenades, in this case with sulfuric and other dangerous acids. Pencils, dental floss, paper clips may also be regulated. But they may be the type of products which might raise substantial due process questions if Congress did not require, as in Murdock, "mens rea" as to each ingredient of the offense. But where, as here and as in Balint and Freed, dangerous and deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation.
 
 
 33
 Id. at 564-565.
 
 
 34
 Thus, as in Wulff, while jewelry made from owl and hawk talons may not be such as to alert the possessor of regulation, dangerous weapons clearly do alert the possessor to the probability of regulation. Possession of such weapons is "a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety." Liparota v. United States, 105 S.Ct. 2084, 2092 (1985). Accordingly, I would hold that the penalty provisions of the National Firearms Act, when viewed in conjunction with the lack of criminal intent required to violate the Act, do not offend the due process clause.
 
 
 
 [1]
 Defendant does not challenge whether probable cause for a search warrant existed
 
 
 [2]
 Klein testified, among other things that he had silencer kits, that he possessed a "German MG-42 machine gun", that he possessed an AK-47 automatic rifle, that he possessed a "MAC-10, .45 caliber submachine gun", that he assembled a fully automatic gun for himself, that he possessed an M-10, 9 mm machine gun and agreed to sell it, that he knew the guns were designed to be fully automatic, and that he altered a gun from semi-automatic to fully automatic