491 A.2d 212

**COMMONWEALTH of Pennsylvania**

v.

**James R. HECK, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 4, 1984.

Filed April 4, 1985.

James H. Thomas, Lancaster, for appellant.

Joseph C. Madenspacher, Assistant District Attorney, Lancaster, for Commonwealth, appellee.

Before CIRILLO, OLSZEWSKI and MONTGOMERY, JJ.

CIRILLO, Judge:

Appellant James Heck challenges the sufficiency of the evidence to support his conviction for a violation of the Pennsylvania vehicular homicide statute, 75 Pa.C.S. § 3732; he also argues on several grounds that the statute is unconstitutional. We find the evidence sufficient to support Heck's conviction, but reverse the judgment of sen-

tence on the ground that the conviction unconstitutionally deprives Heck of due process of law by imposing criminal liability upon a showing of no more than ordinary negligence.

Heck was prosecuted for vehicular homicide based on an accident occurring on the morning of July 26, 1982. He was driving his car northbound on Route 141 in Lancaster County, a route he drove every working day. The sun was up and the weather clear and dry. Heck had to make a left-hand turn onto Union Schoolhouse Lane at its intersection with Route 141; the turn was gradual enough that he could negotiate it at a moderate speed. As he entered the intersection and started to turn left, his car collided with a motorcycle traveling southbound on Route 141. The motorcycle struck the front right fender of the car and bounced backward about eighteen feet. The motorcycle operator, Dennis Ginder, was hurled through the air and fell to the pavement about seventy feet south of the point of impact. Heck sustained a concussion and his car was totalled. Ginder, tragically, died as a result of the injuries he received.

The statute defining the offense of vehicular homicide provided:

> Any person who unintentionally causes the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic is guilty of homicide by vehicle, a misdemeanor of the first degree, when the violation is the cause of death.

75 Pa.C.S.A. § 3732.

In this case the traffic violation Heck was committing at the time of the accident is that proscribed in 75 Pa.C.S. § 3322, "Vehicle turning left": "The driver of a vehicle intending to turn left within an intersection ... shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close as to constitute a hazard."

The troubling questions raised on this appeal center on the level of culpability necessary to prove vehicular homi-

cide. On its face the vehicular homicide statute does not prescribe any particular degree of fault or mens rea as an element of the crime. It imposes liability upon the happening of a certain set of circumstances, namely, a death caused by a person engaged in a traffic violation. The requirement that an underlying traffic violation be the cause of death does not necessarily supply any element of fault to the crime of vehicular homicide. For example, the traffic violation described in Section 3322 of the Vehicle Code does not inherently depend on culpable conduct. One may reasonably misjudge whether an approaching auto is so close as to constitute a hazard; Section 3322 does not expressly forgive such a miscalculation. *See generally* Mancke, *Homicide by Vehicle in Pennsylvania: A Question of Meaning and Constitutionality,* 85 Dick.L.Rev. 391 (1981) (on this latter proposition, see especially nn. 43–44 and accompanying text).

Thus, an early interpretation of the vehicular homicide law held that it created a strict liability offense. *Commonwealth v. Barone,* 276 Pa.Super. 282, 419 A.2d 457 (1980) (per two concurring and three dissenting judges).

However, in *Commonwealth v. Field,* 490 Pa. 519, 417 A.2d 160 (1980), our Supreme Court determined that the vehicular homicide statute does require a showing of culpable conduct and therefore does not create a strict liability offense. The Court defined the level of culpability required by the statute as a showing that the defendant "has deviated from the standard of care established by . . . the underlying Vehicle Code provision," *id.,* 490 Pa. at 524, 417 A.2d at 163, and that he "knew, or should have known, he engaged in the conduct claimed to be in violation of that section," *id.,* 490 Pa. at 525, 417 A.2d 160. In *Field* the underlying Vehicle Code violation was driving on a sidewalk, 75 Pa.C.S. § 3703. The Court held that at trial the Commonwealth would have to prove that a "reasonable driver could . . . know" that there was a sidewalk where the defendant was driving when his vehicle struck the victim. *Field, supra, id.*

Thus, the Supreme Court set up a "reasonable man" standard as the test of culpability for vehicular homicide to save the statute from the constitutional objection that it imposed liability without fault. Subsequent decisions have made it clear that the *Field* standard for judging vehicular homicide cases differs little if at all from the standard of reasonableness governing negligence claims in civil damage suits.

In *Commonwealth v. Houtz,* 496 Pa. 345, 437 A.2d 385 (1981), the Supreme Court distinguished the Commonwealth's burden of proof in a vehicular homicide case from its burden in an involuntary manslaughter prosecution. The Court held that the degree of culpability required to prove homicide by vehicle is less than that necessary to establish involuntary manslaughter, which involves a "reckless or grossly negligent" killing. 18 Pa.C.S. § 2504. *See Commonwealth. v. Lobiondo,* 501 Pa. 599, 462 A.2d 662 (1983) (recklessness and gross negligence under the involuntary manslaughter statute construed as the same). The Crimes Code defines recklessness as a conscious disregard of a substantial and unjustifiable risk amounting to a "gross deviation" from a reasonable standard of conduct, 18 Pa.C.S. § 302(b)(3); the Supreme Court in *Houtz* found that the requirement in vehicular homicide that the driver "knew or should have known" of his culpable conduct is a "relaxation" of the standard of recklessness required to make out involuntary manslaughter. 496 Pa. at 348–49, 437 A.2d at 387.

Based on *Field* and *Houtz,* this Court in *Commonwealth v. Koch,* 297 Pa.Super. 350, 443 A.2d 1157 (1982) summarized the elements of the crime of vehicular homicide as follows:

1. The defendant deviated from the standard of care established by a traffic law or regulation;

2. The defendant knew or should have known he was engaged in the conduct violating the traffic law;

3. A death occurred;

4. The death was a probable consequence of the defendant's violation.

We explained further in *Koch* that the level of culpability embodied in the requirement that the defendant "knew or should have known" of his violation is lesser than "criminal negligence" as defined in the Crimes Code. Criminal negligence is present where the actor's failure to perceive a substantial and unjustifiable risk is a gross deviation from the standard of care that a reasonable person would observe in the actor's situation. 18 Pa.C.S. § 302(b)(4). While both criminal negligence and recklessness involve "gross" deviations from reasonable conduct, recklessness includes conscious disregard of a risk whereas criminal negligence is accompanied by lack of awareness of a risk.

By defining a level of culpability for vehicular homicide below criminal negligence, the courts interpreting the statute have lessened the Commonwealth's usual burden in a criminal case to prove at least reckless conduct, *see id.* § 302(c), and have done away with any requirement that a "gross" deviation from reasonable conduct be shown. A mere deviation from reasonableness therefore suffices. Thus, where the defendant did not know he was committing the traffic violation which caused death, but judged by the standard of the reasonable driver he should have known, he may be found guilty of homicide by vehicle.

■ Of course, as the *Field* Court pointed out, because vehicular homicide is a crime the Commonwealth must prove its case beyond a reasonable doubt. However, all it must prove beyond a reasonable doubt is that the defendant was unaware when he should have been aware of committing the traffic violation which resulted in death (unless it can prove the higher threshold under *Field* of actual knowledge of the violation). A driver's failure to act with reasonable care or attention in the circumstances is nothing more than proof of his negligence as that term is used in the civil law. *See* 27 P.L.E. *Negligence* §§ 1, 3 (1960). Hence vehicular homicide is a crime predicated on "civil," "simple," or "ordinary" negligence; Spaeth, J., concurring in

*Koch, supra; see* 30 Words and Phrases, "Ordinary Negligence" (1970 & 1984 Supp.); and in that respect our law is similar to the vehicular homicide laws of several other states, *see* Annot., 20 A.L.R.3d 473 (1968).

I. Sufficiency of the Evidence

■ We now turn to the sufficiency of the evidence to prove beyond a reasonable doubt that Heck's traffic infraction was negligent. In making this assessment we must accept all evidence and inferences deducible therefrom in the light most favorable to the Commonwealth as verdict-winner. The Commonwealth's evidence showed that Heck had 150 feet of visibility from the intersection north to the crest of a hill. Corporal Studenroth of the Pennsylvania State Police, who happened to be stopped at the intersection on Union Schoolhouse Lane at the time of the accident, clearly saw Ginder's motorcycle approaching. The Corporal estimated the speed of the motorcycle as at least 55 MPH, an estimate confirmed by a defense witness. (A third witness's estimate of Ginder's speed about a mile before the accident was so self-contradictory and inconclusive that we find it unusable for establishing Ginder's speed at impact).

Based on the credible estimates of speed and distance, it took Ginder nearly two seconds to reach the point of impact from the crest of the hill (150 ft. divided by 81 ft./sec. [approx. 55 MPH] = approx. 1.85 secs.). Thus Ginder's motorcycle was visible to Heck for these two seconds before the crash. (Had Heck started his turn before Ginder crested the hill, undoubtedly Heck's car would not have been struck in the right front fender as it was). We cannot as a matter of law overturn the finding of the Lancaster County jury that beyond a reasonable doubt Heck should have seen Ginder in time to avoid the accident. We therefore must conclude that the evidence was sufficient to establish a negligent violation of the traffic law, and thereby vehicular homicide under the *Field* standard. *Cf., e.g., Commonwealth v. Setsodi,* 303 Pa.Super. 482, 450 A.2d 29 (1982) (prima facie case of vehicular homicide made out where

defendant failed to perceive approaching motorcycle while turning left into driveway); *Commonwealth v. Hartzell,* 282 Pa.Super. 549, 423 A.2d 381 (1980) (failure to yield right-of-way at stop sign); *see also Commonwealth v. Koch, supra* (same).

■ Although we find the evidence sufficient to uphold a finding that Heck *should* have known he was violating Section 3322 of the Vehicle Code (Vehicle turning left), we find it insufficient to establish any degree of culpability higher than ordinary negligence. Specifically, the evidence failed to prove that Heck *knew* when he began his turn that Ginder was so close as to constitute a hazard. Had this prong of the *Field* test for sufficiency been proven, it could be said that Heck proceeded in the face of a known illegal risk, and we could conclude that Ginder's death was the result of greater than ordinary negligence. However, Heck testified that he did not see Ginder until the moment before impact. Of course, the jury was free to disbelieve this testimony; but there was insufficient evidence aside from it to corroborate a theory of guilty knowledge. The intersection itself was on a high spot of ground and afforded the Corporal a vantage point from which to watch both vehicles approaching. Each vehicle entered a slight dip or "gully" immediately before the intersection. This configuration of the road would not have altogether prevented someone in Heck's position from seeing the motorcycle after it crested the hill. However, Corporal Studenroth saw no outward indication that the driver of the automobile in fact noticed the motorcycle; the car did not skid or slide before impact, nor did it speed up; it simply turned in front of the cycle. *See Commonwealth v. Barone, supra* (similar evidence relevant to negate mens rea).

Another officer who attempted to reconstruct the accident after the fact found skid marks at the scene which he linked to the Heck vehicle. We must view this evidence with caution because the trooper was unable to say with certainty that the skid marks came from Heck's car. Even if believed, the trooper's testimony viewed in light of the

other credible evidence established at most that Heck perceived the motorcycle too late to conform his conduct to what he saw. *See also Reed v. Hutchinson,* 331 Pa.Super. 404, 480 A.2d 1096 (1984) (inadmissibility of non-eyewitness police officer's opinion as to cause of accident).

Moreover, we find the evidence insufficient to prove that Heck's failure to apprehend the hazard in time was a "gross" deviation from a reasonable standard of care. We perceive *Barone, supra,* to be controlling on this issue. In that case a motorcycle operator was killed when Barone waited "patiently" at a stop sign, then tried to cross the intersection after she "apparently either failed to look to her right or misjudged the distance and rate of speed of the oncoming traffic." 276 Pa.Super. at 299, 419 A.2d at 466–67 (lead opinion by then-President Judge Cercone). The *Barone* Court was in agreement that the evidence failed to prove conduct amounting to "gross" negligence or criminal negligence. (*Barone* was decided at a time when the culpability element of vehicular homicide remained unsettled).

We follow *Barone* in holding the evidence in this case insufficient to prove criminal negligence. All the evidence points unerringly to the single conclusion that Heck was at most ordinarily negligent in causing the accident; his momentary inadvertence led to Ginder's death.

II. Constitutionality of the Law

■ The constitutional issue thus framed for our review is whether due process of law permits a conviction under Section 3732 based on the defendant's ordinary negligence in violating a traffic law, where the violation was neither knowing nor criminally negligent. We conclude that such liability offends due process.

■ Before reaching the reasons for the holding, we comment briefly on appellant's other challenges to the constitutionality of Section 3732. In *Commonwealth v. Burt,* 490 Pa. 173, 415 A.2d 87 (1980) and in *Field, supra,* it was held that the statute was not violative of due process for being vague and indefinite. We find the analysis

presented in these cases sufficient to refute appellant's analogous claim that Section 3322, the underlying Vehicle Code provision in this case, is vague and indefinite. Appellant next contends that the *Field* requirement that death be a "probable consequence" of the violation renders the statute unconstitutional because it imposes criminal liability on an "absolute liability" theory of causation, *see* 18 Pa.C.S. § 303(d). In light of our primary holding that the present conviction violates substantive due process, we will not address whether the causation element of vehicular homicide is constitutional. We will mention that there is dictum to the effect that *Field* precludes such a claim. *See Commonwealth v. Pavlocak*, 299 Pa.Super. 439, 445 A.2d 834 (1982); *but see Commonwealth v. Dell*, 301 Pa.Super. 387, 447 A.2d 1021 (1982) (leaving question open). Appellant also claims that the vehicular homicide law permits cruel and unusual punishment. We dismissed that contention in *Commonwealth v. Gotto*, 306 Pa.Super. 434, 452 A.2d 803 (1982). Appellant's argument that the statute violates equal protection under the law was rejected in *Commonwealth v. Hicks*, 502 Pa. 344, 466 A.2d 613 (1983), appeal dism'd, —— U.S. ——, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984). Finally, appellant's claim that the statute violates procedural due process misconceives the Commonwealth's burden under *Field* to prove every element of the crime of vehicular homicide beyond a reasonable doubt.

We have assured ourselves, however, that neither *Field* nor *Koch, supra,* nor any other case has dispositively decided appellant's remaining contention that it violates substantive due process to impose liability under the vehicular homicide statute upon a mere showing of ordinary negligence. *Field* and *Koch* held that because the crime contains an element of fault, the statute could not be constitutionally challenged for imposing *liability without fault*. *See also Commonwealth v. King*, 298 Pa.Super. 499, 444 A.2d 1294 (1982). The separate question now to be decided is whether the element of fault defined in those decisions passes constitutional muster in the case at bar.

The constitutionality of premising liability for vehicular homicide on ordinary negligence was not raised in either *Field* or *Koch,* which leads us to conclude that the question remains open. *See Jameson v. Pittsburgh,* 381 Pa. 366, 113 A.2d 454 (1955) (portions of statute previously construed by Supreme Court could be found unconstitutional where constitutional issue neither raised nor passed upon in prior case). Our conclusion is the same one reached by our eminent President Judge (then Judge) Spaeth, who in his concurring opinion in *Koch, supra,* opined that the *Field* decision had not decided nor precluded a due process challenge to liability for vehicular homicide based on ordinary negligence. *See also Dell, supra* (opining that *Field's* determination of causation element of vehicular homicide did not preclude later challenge to that element) (dictum). Thus, we proceed to the merits of the substantive due process issue.

■ The constitutional protection upon which appellant relies is independently based in the due process clause of the United States Constitution and the law of the land clause of the Pennsylvania Constitution. U.S. Const. amend. XIV; Pa. Const. art. 1, § 9. These provisions guarantee that a person is not to be deprived of life, liberty, or property without due process of law (14th Amendment) or unless by the law of the land (Article 1, Section 9). The terms "law of the land" and "due process of law" are legal equivalents. *Eiffert v. Pennsylvania Central Brewing Co.,* 141 Pa.Super. 543, 15 A.2d 723 (1940).

■ Due process of law insures respect for those personal immunities so rooted in the traditions and conscience of our people as to be ranked as fundamental, or those implicit in the concept of ordered liberty. *Commonwealth v. Mayhugh,* 233 Pa.Super. 24, 336 A.2d 379 (1975) (allocatur denied). The touchstone of due process is protection of the individual against arbitrary government action. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Commonwealth v. Hernandez,* 339 Pa.Super. 32, 488 A.2d 293 (1985).

■ Included in the concept of due process is a degree of protection against the imposition of criminal liability without criminal intent on the part of the actor.

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.

*Morissette v. United States*, 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1951). *See also Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (lead opinion, Part I).

■ The High Court has discovered no absolute due process requirement that the legislature condition criminal liability on the intent, knowledge, or diligence of the actor; in certain cases mens rea may be dispensed with completely if the legislative intention is to create a strict liability crime. *See Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). However, the legislature's power to eliminate mens rea is not without limitation, and the exercise of that power must comport with constitutional principles. *See Smith v. California*, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

*Morissette, supra,* is the seminal case for the precept that there are due process limitations on the legislative power to remove intent from a criminal enactment. The Court there distinguished common law crimes from the "public welfare" offenses of more recent origin, the latter consisting mainly of violations of regulatory provisions brought on by the industrial revolution and enacted to "heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare." 342 U.S. at 254, 72 S.Ct. at 245, 96 L.Ed. at 296. The Court noted that regulatory offenses do not come under any

> accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of

positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, *penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime. This has not, however, been without expressions of misgiving.*

*Id.* at 255–57, 72 S.Ct. at 245, 96 L.Ed. at 296–97 (footnotes omitted, emphasis added). In a footnote to this passage, the Court tacitly gave credence to the proposition that mere negligence may not satisfy the demand of the common law for criminal intent as a prerequisite to criminal liability:

Radin, Intent, Criminal, 8 Enc Soc Sci 126, 130, says, "... As long as in popular belief intention and freedom of the will are taken as axiomatic, no penal system that negates the mental element can find general acceptance. It is vital to retain public support of methods of dealing with crime." Again, "The question of criminal intent will

probably always have something of an academic taint. Nevertheless, the fact remains that determination of the boundary between *intent and negligence* spells freedom or condemnation for thousands of individuals. The watchfulness of the jurist justifies itself at present in its insistence upon the examination of the mind of each individual offender."

*Id.* at 255 n. 14, 72 S.Ct. at 245 n. 14, 96 L.Ed. at 296 n. 14 (emphasis added).

In *Holdridge v. United States*, 282 F.2d 302 (8th Cir. 1960), Justice Blackmun, then a Circuit Judge, distilled from *Morissette* and other cases the wisdom of the Supreme Court on the permissibility of imposing criminal sanctions on actions done without intent:

From these cases emerges the proposition that where a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.

*Id.* at 310.

Of course, logic leads to the conclusion that should the factors enumerated by Justice Blackmun be otherwise, then elimination of intent from criminal legislation may violate due process of law. *See Barone, supra* (Spaeth, J., concurring) (collecting federal cases applying *Holdridge* analysis).

In *Commonwealth v. Koczwara*, 397 Pa. 575, 155 A.2d 825 (1959), the Pennsylvania Supreme Court found an independent state constitutional principle of due process requiring an element of intent in a criminal statute. The statute at issue purported to impose absolute vicarious liability upon the holder of a liquor license whose employees or

agents violated certain provisions of the Liquor Code. The license-holder had been convicted and sentenced to serve three months in jail. Employing an analysis similar to that used in *Morissette,* the Court distinguished between "true crimes" and

> regulatory provisions in fields which are essentially non-criminal, e.g., pure food and drug acts, speeding ordinances, building regulations, and child labor, minimum wage and maximum hour legislation. *Such statutes are generally enforceable by light penalties, and although violations are labelled crimes, the considerations applicable to them are totally different from those applicable to true crimes, which involve moral delinquency and which are punishable by imprisonment or another serious penalty.* Such so-called statutory crimes are in reality an attempt to utilize the machinery of criminal administration as an enforcing arm for social regulations of a purely civil nature, with the punishment totally unrelated to questions of moral wrongdoing or guilt. It is here that the social interest in the general well-being and security of the populace has been held to outweigh the individual interest of the particular defendant. The penalty is imposed despite the defendant's lack of a criminal intent or mens rea.

397 Pa. at 580, 155 A.2d at 827 (emphasis added).

Finding any term of imprisonment to be too severe a penalty for a crime based on absolute vicarious liability, the Court struck down the three-month sentence imposed on Koczwara as abhorrent to the law of the land clause of the Pennsylvania Constitution.

In recent dicta the Supreme Court has moved toward limiting the *Koczwara* holding to vicarious crimes. *See Commonwealth v. Mikulan,* 504 Pa. 244, 470 A.2d 1339 (1983) (Opinion by Larsen, J., joined by Zappala, J.); *Commonwealth v. Robinson,* 497 Pa. 49, 54 n. 3, 438 A.2d 964, 967 n. 3 (1981), *appeal dism'd,* 457 U.S. 1101, 102 S.Ct. 2898, 73 L.Ed.2d 1310 (1982). However, the language of

*Koczwara* indicates a broader concern with retaining mens rea as a general prerequisite to criminal liability:

The Supreme Court of the United States has had occasion only recently to impose due process limitations upon the actions of a state legislature in making *unknowing* conduct criminal. *Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, [2 L.Ed.2d 228] (1957). Our own courts have stepped in time and again to protect a defendant from being held criminally responsible for acts *about which he had no knowledge and over which he had little control. Commonwealth v. Unkrich,* 142 Pa.Superior Ct. 591, 16 A.2d 737 (1940); *Commonwealth v. Schambers,* 105 Pa. Superior Ct. 467, 161 Atl. 624 (1932); *Commonwealth v. Rovnianek,* 12 Pa.Superior Ct. 86 (1899). We would be utterly remiss were we not to so act under these facts.

397 Pa. at 586, 155 A.2d at 830 (emphasis added). Of the cases cited in this passage, only *Rovnianek* involved an attempt to impose vicarious criminal liability.

As Judge Spaeth noted in *Barone, supra,* "While *Koczwara* involved vicarious liability . . . . [t]he Court made it clear that to imprison someone for anything other than a true crime was unconstitutional; and it defined a true crime as one that involves *both* 'moral delinquency' and 'personal causation.'" 276 Pa.Super. at 331, 419 A.2d at 483. Moreover, our Court has used *Koczwara* as a tool of statutory interpretation to supply an element of intent to crimes based on personal causation. *See Commonwealth v. Black,* 251 Pa.Super. 539, 380 A.2d 911 (1977) (retail theft); *Commonwealth v. Bready,* 220 Pa.Super. 157, 286 A.2d 654 (1971) (allocatur denied) (magistrate's failure to make monthly report).

■ The task of statutory interpretation of the vehicular homicide law has already been completed, with *Field* and *Koch* having decided that vehicular homicide is not a strict liability crime, but one based on ordinary negligence. The question is whether it is consistent with due process to permit such liability. We have borne in mind that an act of the legislature enjoys a presumption of constitutional validi-

ty which is not overcome unless the law "clearly, palpably, and plainly" violates the constitution. *See Commonwealth v. Robinson, supra; Commonwealth v. Grady,* 337 Pa.Super. 174, 486 A.2d 962 (1984). Nevertheless, we are compelled to find that a vehicular homicide law predicated on ordinary negligence violates the constitution.

■ Judged by the considerations set out in *Morissette, Holdridge,* and *Koczwara,* vehicular homicide as presently constituted in Pennsylvania cannot be dismissed as a "public welfare" offense for which an absence of mens rea is of minor constitutional significance. The crime is graded, punished, and must be treated as a "true crime."

■ No doubt the statute seeks to heighten the duty of care owed by drivers, and thereby to promote the public welfare by curbing the tide of senseless carnage on our highways. This important goal of the law is comparable to the public welfare interest in regulating the liquor trade, which the statute considered in *Koczwara* sought to do. However, all other relevant factors demonstrate overwhelmingly that the law is penal in nature. The penalties under the statute are not light but severe; a conviction "gravely besmirches" the reputation of the offender; and the very label "vehicular homicide" identifies the crime as one taken over from the common law hierarchy of crimes involving moral condemnation.

As a misdemeanor of the first degree, vehicular homicide carries a maximum possible jail sentence of five years. 18 Pa.C.S. § 1104(1). Since a violator's driver's license is revoked, 75 Pa.C.S. § 1532(a), the penalty for vehicular homicide actually can be greater than that for involuntary manslaughter, a crime with a higher level of culpability.

The fact alone that a substantial term of imprisonment may be imposed for vehicular homicide is perhaps the best evidence of the gravity of the offense. Undoubtedly it is "the imprisonment in a penitentiary, which now renders a crime infamous." *United States v. Moreland,* 258 U.S. 433, 447, 42 S.Ct. 368, 373, 66 L.Ed. 700, 706 (1922) (Brandeis, J.,

dissenting, joined by Taft, C.J., and Holmes, J.). Short of the death penalty, a prison sentence is the worst stamp of criminality that society can place on a man, wherefore an influential commentator on mens rea in criminal law has stated:

if the offense be punishable by imprisonment, the individual interest of the defendant weighs too heavily to allow conviction without proof of guilty mind. To subject defendants entirely free from moral blameworthiness to the possibility of prison sentences is revolting to the community sense of justice; and no law which violates this fundamental instinct can long endure.

Sayre, *Public Welfare Offenses,* 33 Col.L.Rev. 55, 72 (1933). *See also* Packer, *Mens Rea and the Supreme Court,* 1962 Sup.Ct.Rev. 107, 150.

This severity of possible punishment combined with the statutory classification of the crime indicate beyond any doubt the onerous moral stigma that attaches to someone convicted of vehicular homicide. As a first-degree misdemeanor it is classified and punished the same as other crimes of that degree, which include possession of instruments of crime or prohibited offensive weapons, 18 Pa.C.S. §§ 907, 908; aggravated assault on a police officer or with a deadly weapon, *id.* § 2702(a)(3), (4); theft of property valued under $2,000, *id.* §§ 3921–3932; providing weapons to or possessing weapons by an inmate, *id.* § 5122(a)(1), (2); various firearms offenses, *id.* §§ 6105–6111; and, of course, involuntary manslaughter, *id.* § 2504. All of these other serious misdemeanors require at least reckless conduct before their serious consequences are visited on the offender. *Cf. Commonwealth v. Frisbie,* 506 Pa. 461, 485 A.2d 1098 (1984) ("Among [the purposes of the Crimes Code] are that of insuring that punishment is proportionate with criminal liability, 18 Pa.C.S.A. § 104(3), and that of differentiating among offenders based on the seriousness of their offenses, 18 Pa.C.S.A. § 104(5).") 506 Pa. at 467, 485 A.2d at 1100–1101.

The burdens of stigma and punishment accompanying a vehicular homicide conviction can only be aggravated when the negligent driver who has caused a death goes down on the public record as guilty of "homicide." As Judge Spaeth aptly observed in *Commonwealth v. Koch, supra,* 297 Pa.Super. at 365, 443 A.2d at 1165, this designation blots the defendant's name with the ignominy of having been found a "criminal killer." He also pointed out, in *Commonwealth v. Barone, supra,* that

> one cannot truthfully say to any defendant that there is nothing wrong with being labeled a criminal. Hart, *The Aims of the Criminal Law,* 23 Law & Contemp.Prob. 401, 423 n. 57 (1958). Especially is this so when the crime is "homicide by vehicle." Labels may not be ignored. To be labeled a rapist or murderer places a far more onerous stigma on a person than to be labeled as someone convicted of misbranding a drug.... While the word "homicide", by itself, means only the killing of a human being, included within this definition are the terms "murder" and "manslaughter." Indeed, the Crimes Code defines the term "criminal homicide" so as to include "murder" and "manslaughter." *See* 18 Pa.C.S. § 2501(b). Adding the phrase "by vehicle" does little to lessen the stigma attached to the word "homicide," except perhaps among lawyers. In popular parlance, "homicide" is usually equated with "murder."

276 Pa.Super. at 323–24, 419 A.2d at 479 (Spaeth, J., concurring, joined by Hoffman, J.); *see also id.* (lead opinion by Cercone, P.J., joined by Cavanaugh, J.).

■ We are led to the inevitable conclusion that a conviction for violating the vehicular homicide law carries with it the stamp of criminality and the kind of opprobrium that under the common law was reserved for true crimes of moral turpitude. The only factor remaining to be considered is the reasonableness of imposing such grave consequences upon a driver whose violation of a traffic law is only ordinarily negligent.

To demonstrate the unreasonableness of such liability, let us clarify the nature of an act of simple negligence to show how far it differs from an act that would traditionally be thought of as a crime. Ordinary negligence is the "antithesis" of willful or intentional conduct. *Stenson v. Laclede Gas Co.*, 553 S.W.2d 309 (Mo.Ct.App.1977). Hall, in *Negligent Behavior Should Be Excluded from Penal Liability*, 63 Col.L.Rev. 632, 634 (1963), illuminates the "vast difference" between negligent and conscious wrongdoing:

It should from the outset be borne in mind that negligent behavior implies inadvertence and must therefore be sharply distinguished from voluntary harm-doing, *i.e.* from conduct that includes at least an awareness of possible harm. If, for example, one who is about to drive an automobile knows that he is ill or very tired or if he drinks alcoholic beverage knowing this will incapacitate him, subsequent damage may justifiably be attributed to the immediately prior conduct. Taking all the directly relevant facts into account, it is tenable, though far from self-evident, to hold that he was reckless, not merely negligent. This would seem to fall within the Model Penal Code's definition of recklessness as conscious disregard for "a substantial and unjustifiable risk." ... With respect to negligent damage, however, neither at the time of the damage nor shortly prior to it, *i.e.,* the time immediately related to the dangerous behavior in issue, does the defendant have knowledge, belief, or suspicion that he is endangering anything socially valued. The vast difference between voluntary harm-doing and negligent damage was expressed in Mr. Justice Holmes's graphic terms that even a dog understands the difference between being kicked and being stumbled over.

Modern legal systems which maintain respect for the individual's free will have refused to punish negligent harm-doing as criminal precisely because, as was stated in *Westrup v. Commonwealth*, 123 Ky. 95, 101, 93 S.W. 646, 648 (1906), "One cannot be said in any manner to neglect or refuse to perform a duty unless he has *knowledge* of the

condition of things which require performance at his hands." (Emphasis added). In other words "knowledge," broadly understood, is the least common denominator of the various levels of "criminal intent." Intentional, knowing, and reckless actions all involve the actor's consciousness of "endangering something socially valued"; the precise culpability level that applies depends on whether the actor intends a risk as the consequence of his actions, or knows the risk will be created by his actions, or is aware of the likelihood of the risk but chooses to disregard it. *See* 18 Pa.C.S. § 302(b)(1)–(3).

■ In a fundamental sense the harshness of criminal punishment is fitting only for these types of consciously inflicted wrongs, and so traditionally the criminal law has concerned itself exclusively with conscious wrongdoing. *See Morissette, supra; United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943); Turner, Kenny's Outlines of Criminal Law 34 (1962) (English common law). Where harm is perpetrated inadvertently without awareness or choice, recovery for negligence may be had under the civil law, consistent with its aim to fairly shift the economic costs of injuries onto those responsible for them. *See* Packer, 1962 Sup.Ct.Rev., *supra,* at 148. Of course, when someone is killed through inadvertence or negligence, monetary recovery can never make up for the loss. But even though there may be an unreasoning desire for retribution on the part of the victim's heirs, it can serve no rational purpose of the criminal law to subject the merely negligent actor to the additional punitive sanctions of the criminal law. *See* 1 Working Papers of the National Commission on the Reform of Federal Criminal Laws, 129. *Cf. Stenson v. Gas Co., supra* (punitive civil damages unavailable for ordinary negligence).

[S]uch sanction serves none of the principal, preferred purposes of criminal prosecutions—deterrence, rehabilitation and isolation of dangerous people from society. *See Morissette v. United States,* 342 U.S. at 251, 72 S.Ct. at 243, 96 L.Ed. at 294; ... W. LaFave & A. Scott, [*Hand-*

*book on Criminal Law* ] § 5, at 22–23 [ (1972) ]. "Retribution is no longer the dominant objective of the criminal law." *Williams v. New York,* 337 U.S. 241, 248, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337, 1343 (1949). One who is not aware of the criminality of his conduct cannot be deterred from performing it. And one who is morally blameless need not be isolated from society or rehabilitated. *See* W. LaFave & A. Scott, supra § 32, at 222. . . .

*State v. Conner,* 292 N.W.2d 682, 687 (Iowa 1980) (Opinion by Allbee, J., joined by Reynoldson, C.J., and Larson, J.).

■ In Pennsylvania it had long been the law that one could not be held criminally liable for homicide unless he freely willed the act causing death in circumstances where he was at least cognizant of the probable consequences of his act. *See Commonwealth v. Gilliland,* 281 Pa.Super. 354, 422 A.2d 206 (1980) (involuntary manslaughter; boat accident). One of the purposes of the vehicular homicide law was to ease the prosecutor's burden of proof in cases arising from automobile accidents. *See Houtz, supra; but see* Mancke, 85 Dick.L.Rev., *supra,* at 394 (no legislative history on the statute). But the legislative decision to criminalize negligent driving if it happens to result in death does not make a true criminal of a merely negligent driver. Obviously such a driver never intends to take a life, and to make his negligence criminal based purely on this fortuitous outcome can have little deterrent effect on the incidence of negligent driving. A driver engaged in the negligent but unknowing commission of a traffic offense does not reflect at all on the possibility of killing someone; and it is almost absurd to suggest that he would drive more carefully if he knew it was a serious criminal offense to kill someone while driving negligently. A commentator has remarked thusly on "the fallacy of convicting the unfortunate driver":

Our finest citizens drive on the highways and are, at times, guilty of traffic infractions. When such an infraction results in the death of another, a jail sentence is not needed for them to realize their wrong. They did not

mean to kill the first time, and the resulting mental torture from feeling they took another's life will more than insure that their driving habits will be corrected in the future.

Comment, *The Fallacy and Fortuity of Motor Vehicle Homicide*, 41 Neb.L.Rev. 793, 812–13 (1962).

At this point we must recognize that there is a state of mind involving "lack of awareness" that requires a very different judicial attitude than the type of negligence we have been talking about. This exception to our discussion is "criminal negligence." Pennsylvania has adopted the Model Penal Code concept of criminal negligence, 18 Pa.C.S. § 302(b)(4), and our Supreme Court has upheld the constitutionality of criminal liability based on criminal negligence. *Commonwealth v. Lobiondo, supra* (simple assault under 18 Pa.C.S. § 2701(a)(2) ) (Court cited *Field* and *Koch* for proposition that it is constitutional to make less than reckless conduct criminal; insofar as the statement may be applied to less than *criminally negligent* conduct, it is dictum).

 It is not all that difficult to harmonize the idea of criminal negligence with the dominant theme of the criminal law to punish only acts done with a guilty mind. We must remember that criminal negligence involves a *gross* deviation from reasonable care such that it would be shocking to allow the actor's lack of awareness to excuse his actions in the circumstances. The criminally negligent act has been done so heedlessly, so indifferently, and so grossly contrary to common experience that it becomes intolerable to reasoning minds that the actor did not perceive the risk of harm created by his conduct. In such cases the law presumes wantonness even though the circumstances do not allow proof beyond a reasonable doubt of the actor's subjective awareness of wrongdoing. "Criminal negligence" is a breach of duty so flagrant in the circumstances that we may safely indulge the legal fiction that it was committed with actual intent to injure; *see Schultz v. State*, 89 Neb. 34, 130 N.W. 972 (1911); it is far from mere ordinary

negligence or inadvertence; it is "great" negligence incompatible with a proper regard for human life; *People v. Peabody*, 46 Cal.App.3d 43, 119 Cal.Rptr. 780 (1975); *State ex rel. Zent v. Yanny*, 244 Wis. 342, 12 N.W.2d 45 (1943). *See also* W. LaFave & A. Scott, *supra*, § 30, at 209–15. The judicial conscience therefore does not revolt at labelling it criminal.

We have already eliminated the possibility that Mr. Heck was criminally negligent in the matter of Ginder's death, and shown that Heck was convicted for ordinary negligence. Aside from vehicular homicide, we remain "unaware of any other criminal offense in Pennsylvania for which ordinary negligence is the required level of liability." Spaeth, J., concurring in *Koch, supra,* 297 Pa.Super. at 365, 443 A.2d at 1165. Indeed, we can discover no offense in Pennsylvania as serious as vehicular homicide for which even *criminal* negligence is a sufficient level of culpability. *See Lobiondo* (second-degree misdemeanor of "negligent" assault with a deadly weapon); *cf. Commonwealth v. Kauffman*, 323 Pa.Super. 363, 470 A.2d 634 (1983) (summary offense of leaving the scene of an accident); *cf. also* 18 Pa.C.S. § 3304(a)(1), (b) (summary offense of criminal mischief by negligence).

■■■ The serious felony of statutory rape is a likely candidate for a crime that may be committed without guilty knowledge, *see* 18 Pa.C.S. §§ 3122, 3102; but closer inspection reveals that there is an element of mens rea to the crime. In *Commonwealth v. Robinson, supra,* our state high Court held that the legislature may constitutionally bar the defense of reasonable mistaken belief as to age in a statutory rape prosecution. Said the Court, "In an exercise of its police powers, the legislature *rationally* may require that one eighteen years of age or older *who engages in sexual intercourse with a child below fourteen years of age does so at his own peril. Such activity may be punished criminally if the child is indeed under fourteen years.*" 497 Pa. at 54, 438 A.2d at 966 (emphasis added). Thus, it is legislatively declared to be per se unreasonable

to engage in sexual intercourse with someone under fourteen years old. *Contra, State v. Guest,* 583 P.2d 836 (Alk.1978) (upholding reasonable-belief defense to statutory rape). The "sound doctrine" underlying the rule that knowledge of age is not required to accomplish statutory rape is said to be that the defendant who enters upon an admittedly immoral act does so at his own peril and therefore cannot be exonerated merely because he may not have known the exact enormity of his act. *White v. State,* 44 Ohio App. 331, 185 N.E. 64 (1933). One need not fully accept the morality lesson espoused in *White* to agree that an act of fornication with a person of tender years requires knowledge of the nature and consequences of one's actions even though the precise age of the victim may not be known. *Cf. Bell v. State,* 668 P.2d 829 (Alk.App.1983) (rejecting reasonable-belief defense to promoting prostitution of a minor because intent to promote prostitution present). The wisdom of the legislative decision to rule out a reasonable-belief defense to statutory rape can be debated, but it cannot be denied that the statute punishes purposive rather than inadvertent conduct undertaken in circumstances usually giving rise to a fair presumption of guilty knowledge. *See People v. Olsen,* 36 Cal.3d 638, 685 P.2d 52, 205 Cal.Rptr. 492 (1984) (rejecting reasonable mistake defense to charge of lewd and lascivious conduct with child under 14, based on strong public policy to protect children of tender years).

Another profitable comparison on the element of mens rea can be had with the drunk driving law, 75 Pa.C.S. § 3731. While it has been suggested that subsection 3731(a)(4) of the law defines an "absolute liability" offense, *Commonwealth v. Mikulan, supra* (lead opinion by Larsen, J., upholding constitutionality of law), a better rationale for upholding the law is that while a person may not know the exact quantity of alcohol he can consume and still legally drive, he has some awareness of and control over the possible consequences of his decision to drink and drive. *See id.* (concurring opinions by Roberts, C.J., and Nix, J.)

(drunk driving does include mens rea). Compare also the crime of homicide by vehicle while driving under the influence, 75 Pa.C.S. § 3735. With regard to such drunk driving offenses, it has been said that it is by definition criminally negligent to drive while intoxicated. *See Lupro v. State,* 603 P.2d 468 (Alk.1979); *see also State v. Myers,* 88 N.M. 16, 536 P.2d 280 (1975). "Most people who drive can tell when their ability to drive is impaired, much as they can tell when they themselves are intoxicated." *Commonwealth v. Neiswonger,* 338 Pa.Super. 625, 629, 488 A.2d 68, 70 (1985).

But returning our attention to ordinary-negligence vehicular homicide, the defendant's conduct does not approach criminality under any of the traditional mens rea requirements, nor would anyone think to label it criminal if not for the fortuitous result of death on the highway. The injustice of letting serious criminal liability turn on such a fortuity is illustrated by the following hypothetical examples.

Ex. 1: Suppose D's speedometer is off by 5 MPH. For the past hour he has been travelling along the freeway at 60 MPH, although his speedometer registers only 55 MPH. He should know (a jury decides) that his speedometer is slow, and thus should know that he is violating the law by speeding. D kills A, who is stopped by the roadside changing a tire and steps onto the highway while D is passing. D's violation of the maximum speed law caused A's death, for if D hadn't been speeding A would have been finished with his chore and gone before D arrived at that spot on the road. D is liable for vehicular homicide.

Ex. 2: (Stated in the alternative). Suppose D inadvertently fails to dim his headlights, blinding A and causing him to run his car off the road and kill himself; or suppose D forgetfully neglects to turn on his lights before starting on a trip one night, with the result that A, while attempting to turn his vehicle onto the highway, is broadsided and killed. Either way, D is guilty of vehicular homicide, and under the statutory scheme becomes a "criminal killer."

Ex. 3: In this example, we hypothecate that D is a reputable and law-abiding citizen driving to work one morn-

ing. He attempts to turn at an intersection with limited visibility, and fails to see a motorcycle approaching from the opposite direction at 55 MPH, 15 MPH over the speed limit. He is not aware of the motorcycle until it is too late, nor can his momentary inattention be characterized as a "gross" deviation from reasonable care in the circumstances. D may be found guilty of vehicular homicide.

The possible contributory negligence of the victims in these cases will not prevent the defendants from being held criminally liable. This holds true even if the victim's negligence contributing to the accident is greater than the defendant's, so as to bar the victim's estate from winning damages in a civil suit. The rule is that the contributory negligence of the victim is not a defense to a criminal charge of homicide by vehicle if the defendant's actions were a substantial factor in causing the death. *See Commonwealth v. Clowser*, 212 Pa.Super. 208, 239 A.2d 870 (1968). *Accord, Wren v. State*, 577 P.2d 235 (Alk.1978); *State v. Shumway*, 137 Ariz. 585, 672 P.2d 929 (1983); *State v. Arena*, 46 Hawaii 315, 379 P.2d 594 (1963); *State v. Rotella*, 196 Neb. 741, 246 N.W.2d 74 (1976); *Cleveland v. Pellech*, 8 Ohio Misc.2d 37, 457 N.E.2d 961 (1983); *Hart v. State*, 75 Wis.2d 371, 249 N.W.2d 810 (1977).

Nor can these hypothetical defendants expect to be acquitted on the ground that there is an insufficient causal relationship between their traffic violations and the deaths. We acknowledge the enlighted view of the "probable consequence" requirement taken by our brother Judge Zoran Popovich, dissenting in *Koch, supra*, under which these defendants might have escaped liability. Judge Popovich expressed the idea that in order to qualify as the "probable consequence" of a traffic violation, death has to occur as the "likely result." 297 Pa.Super. at 373–74, 443 A.2d at 1169. Since death is not in general a "likely result" of exceeding the speed limit by 5 MPH past a bystander on the road, or of passing another car with one's lights off, perhaps under Judge Popovich's rule these defendants would have to be acquitted. However, his restrictive view of the

"probable consequence" requirement, though appealing, does not prevail in our appellate courts. His understanding appears to restrict the fact finder to the facts that would have been known to a reasonable driver in the defendant's situation for the purpose of determining the "probable consequences" of the defendant's traffic violation. The decisions, however, have taken a harsher and even less subjective approach to causation, and frame the issue in terms of tort concepts of proximate cause. *See Commonwealth v. Houtz, supra;* ("probable consequence" is a relaxation of the direct causation standard used for involuntary manslaughter); *see also Commonwealth v. Dell, supra; Commonwealth v. Pavlocak, supra; Johnson v. State,* 170 Ga.App. 433, 317 S.E.2d 213 (1984) (cert. denied) (citing 7A AmJur.2d, *Automobiles and Highway Traffic* § 325 (1980) as supporting civil standard of causation); *but see Commonwealth v. Root,* 403 Pa. 571, 576, 170 A.2d 310, 312 (1961) ("Legal theory which makes guilt or innocence of criminal homicide depend upon such accidental and fortuitous circumstances as are now embraced by modern tort law's encompassing concept of proximate cause is too harsh to be just."). In determining the sufficiency of causation under the civil standards, we must use more hindsight to ascertain the facts as they actually existed at the time of the accident and pay less attention to what the defendant subjectively could have predicted. *See* Restatement (Second) of Torts § 435, Comment d (1965). The crucial inquiry is whether the defendant's violation was a "substantial factor" in producing the victim's death, *see id.* § 433; we do not inquire whether the defendant should have been able to foresee that his conduct would result in death; *see id.* § 435; *see also* 27 P.L.E. *Negligence* § 76 ("Foreseeability"). Incidentally, the "should have known" language used in *Field* and *Koch* clearly refers only to the defendant's mental state with regard to violating the Vehicle Code; it does not refer to his capacity to know that his conduct would result in death. *See Commonwealth v. Dell, supra.*

■ Accordingly all three of our hypothetical defendants can be convicted of vehicular homicide. Our third hypothetical defendant, of course, is Mr. Heck, and he was in actuality convicted under those very facts. We are unable to conclude otherwise than that he was the victim of prosecution under a substantively irrational law. Heck was fortunate in the sense that the learned judge who heard the case imposed only probation and a fine for his momentary error. Nevertheless, Heck has been saddled with a conviction for the serious crime of vehicular homicide. We think the result is too unfair to be countenanced by rule of law, and so we strike down appellant's conviction as a violation of his constitutional right to due process of law. Our decision, we believe, is in harmony with decisions in other states which have held that a citizen may not be convicted of a serious crime for ordinarily negligent or inadvertent conduct. *Speidel v. State,* 460 P.2d 77 (Alk.1969) (failure to return rental car); *People v. Washburn,* 197 Colo. 419, 593 P.2d 962 (1979) (theft of rental property; *citing People v. Johnson,* 193 Colo. 199, 564 P.2d 116 (1977)); *see also State v. Billings,* 242 N.W.2d 736 (Iowa 1976) (following *Speidel*); *but see State v. Conner, supra.* Compare Alaska cases dealing with "public welfare" type offenses, *e.g., State v. Rice,* 626 P.2d 104 (Alk.1981) (game laws); *Reynolds v. State,* 655 P.2d 1313 (Alk.Ct.App.1982) (fishing in closed waters).

We emphasize that our holding does not purport to decide the constitutionality of vehicular homicide prosecutions where the offender was conscious of wrongdoing or grossly deviated from a reasonable standard of conduct. Moreover, as we would not attempt to define the parameters of the federal Constitution on these uncharted seas, we rest our holding exclusively on the law of the land clause of the Pennsylvania Constitution, art. 1, § 9. *See Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983) (state may provide broader protections for individual rights under state constitution than are recognized under federal Constitution).

Finally, let us assure the concerned student of traffic law that we have considered that the Pennsylvania vehicular homicide statute is derived from Section 11–903 of the Uniform Vehicle Code (1968 rev.), and that numerous States have enacted similar provisions based on the Code. *See* National Committee on Uniform Traffic Laws and Ordinances, Traffic Laws Annotated 272–75 (1979). We have surveyed cases from these States and from all other jurisdictions in the Union in search of a coherent constitutional rationale supporting an ordinary-negligence vehicular homicide law. *See* 1 Pa.C.S. § 1927 (statutory construction of uniform acts). The statutes in a substantial minority of ten jurisdictions appear to allow a conviction to rest on culpable conduct not rising above the level of ordinary negligence. *See* Ala.Code § 32–5A–192 (1983) (no judicial interpretations); Cal.Penal Code § 192(c)(2) (West Supp.1985) (*see In re Dennis B.*, 18 Cal.3d 687, 557 P.2d 514, 135 Cal.Rptr. 82 (1976)); D.C.Code Ann. § 40–713 (1981 & Supp.1984) (*see also Sanderson v. United States*, 125 A.2d 70 (D.C.1956)), Ga.Code Ann. § 40–6–393(b) (Supp.1984) (*see Walker v. State*, 163 Ga.App. 638, 295 S.E.2d 574 (1982) (mere violation) ); Hawaii Rev.Stat. § 707–704 (1976) (*see also State v. Arena, supra* ); Idaho Code § 18–4006(3)(c) (1979 & Supp. 1984) (*see State v. Curtis*, 106 Idaho 483, 680 P.2d 1383 (Ct.App.1984) (dictum) ); Mich.Comp.Laws Ann. § 750.324 (West 1968) (*see People v. McKee*, 15 Mich.App. 382, 166 N.W.2d 688 (1968)); Neb.Rev.Stat. § 28–306 (1979) (*see State v. Mattan*, 207 Neb. 679, 300 N.W.2d 810 (1981)); N.C.Gen.Stat. § 20–141.4(a) (1983) (*see State v. Freeman*, 31 N.C.App. 93, 228 S.E.2d 516, *cert. denied*, 291 N.C. 449, 230 S.E.2d 766 (1976)); Vt.Stat.Ann. tit. 13, § 2304 (1974 & Supp.1984) (involuntary manslaughter statute) (*see State v. Poirier*, 142 Vt. 595, 458 A.2d 1109 (1983), *State v. Labonte*, 120 Vt. 465, 144 A.2d 792 (1958)). *Cf.* Ohio Rev.Code Ann. § 2903.07(a) (Page 1982 & Supp.1984) (*see In re Hanshaw*, (No. 83 CA 35, filed Dec. 11, 1984) (construing statute to require criminal negligence)); Wis.Stat. § 940.08 (1982) (*see State v. Cooper*, 117 Wis.2d 30, 344 N.W.2d 194 (Ct.App. 1983) ("ordinary negligence to a high degree")). Of these

jurisdictions, only Alabama, the District of Columbia, and Vermont would appear to allow the merely negligent driver to suffer incarceration for more than two years. *See, e.g.,* Ala.Code § 32–5A–192(b) (one to five years plus fine); *cf.* Cal.Penal Code § 193(c)(2) (imprisonment for not more than one year); *accord,* Ga.Code Ann. § 17–10–3. Most of the statutes here set out have not yet come under constitutional attack in the reported cases. In any event decisions that have addressed the constitutional issue and held that ordinary negligence is a sufficient level of culpability upon which to predicate liability for vehicular homicide have failed to convince us of the unsoundness of our position taken in this opinion. *State v. Russo,* 38 Conn.Supp. 426, 450 A.2d 857 (Conn.Super.Ct.1982) (decided under Conn. Gen.Stat. § 53a–58a (1977) (repealed 1981)); *State v. Edwards,* 236 Ga. 104, 222 S.E.2d 385 (1976); *People v. McKee, supra.*

The judgment of sentence is reversed and appellant is discharged.