606 A.2d 617

**BAUMGARDNER OIL COMPANY and Elmer Baumgardner, Petitioners,**

v.

**COMMONWEALTH of Pennsylvania, Wade Martin, Dirk Baumgardner, Ken Shearer and Roger Stoey, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Dec. 16, 1991.

Decided March 24, 1992.

Petition for Allowance of Appeal Denied Aug. 27, 1992.

534

Spero T. Lappas, for petitioners.

Roseann B. Termini, Deputy Atty. Gen., Appeals and Legal Services Section, for respondents.

Before DOYLE and PELLEGRINI, JJ., and BARRY, Senior Judge.

DOYLE, Judge.

This is an interlocutory appeal by permission [1] by Baumgardner Oil Company and Elmer Baumgardner (sometimes referred to collectively as BOC) of two orders of the Court of Common Pleas of Franklin County denying an omnibus pretrial motion seeking to dismiss or quash criminal informations filed by the Commonwealth of Pennsylvania charging them with violations of the Solid Waste Management Act (SWMA) [2] and the Crimes Code. [3]

According to the evidence presented at the preliminary hearing, BOC operated a facility which collected and processed used oil from service stations and industrial sources and reprocessed it for sale as fuel oil. The process of converting the used oil to fuel oil involved removing impurities, primarily dirt, lead, and organic halide solvents, from the used oil. The solvents were separated from the oil and transferred to a storage tank; the dirt and lead removed from the oil was concentrated into a sludge material which was, generally, disposed of at the facility.

On November 18, 1986, an employee of BOC sought permission from the Department of Environmental Resources (DER) to dispose of some of the sludge material at a landfill. The employee forwarded a laboratory analysis of the sludge which indicated that the sludge contained high levels of lead. Thereafter, DER conducted an administrative search of the BOC facility seeking evidence of the presence of hazardous waste. DER ultimately referred this

1. *See* Pa.R.A.P. 312.
2. Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. §§ 6018.101–6018.1003.
3. 18 Pa.C.S. §§ 101–9183.

matter to the Attorney General's Office, Environmental Crimes Section, for further investigation.

The Attorney General's Office searched the BOC facility and took samples of materials found at the site. The investigation concluded that the sludge was a hazardous waste because it had a high EP toxicity [4] for lead and that this sludge was improperly disposed of on BOC's property. Further, the solvent was determined to be a hazardous waste because of its ignitability. The investigation, moreover, concluded that BOC improperly blended the solvent waste into the reprocessed oil which it sold to its customers; this was determined to constitute illegal treatment and disposal of a hazardous waste. The investigation also revealed that BOC failed to alert its reprocessed oil customers that a hazardous substance was added to the oil.

On August 22, 1988, a criminal complaint was filed against BOC, and the charges were as follows:

1. Unlawful Management of Hazardous Waste (felony second degree).

2. Unlawful generation, transportation, storage, treatment and disposal of hazardous waste (misdemeanor third degree).

3. Unlawful generation, transportation, storage, treatment and disposal of a hazardous waste—failure to maintain records (misdemeanor third degree).

4. Unlawful generation, transportation, storage, treatment and disposal of hazardous waste—failure to furnish information to others (misdemeanor third degree).

5. Unlawful generation, transportation, storage, treatment and disposal of hazardous waste—unauthorized disposition (misdemeanor third degree).

6. Unlawful use of land as a solid waste processing, storage, treatment or disposal area (misdemeanor third degree).

4. EP is a shortened term for extraction-procedure toxicity test. This test is used to determine if a waste contains levels of a contaminant sufficient to classify it as a hazardous waste.

7. Deceptive business practices (misdemeanor second degree).

8. Conspiracy (misdemeanor third degree).[5]

A preliminary hearing was held before a district justice who determined that the Commonwealth had established a prima facie case against BOC on all counts. Baumgardner was then bound over for further proceedings in the Court of Common Pleas of Pleas of Franklin County.

On January 6, 1989, BOC filed an omnibus pretrial motion which was denied by the trial court on May 3, 1991. On August 26, 1991, the trial court filed an amended order which again denied BOC's motion, but further added the certification required for an interlocutory appeal. *See* Section 702 of the Judicial Code, 42 Pa.C.S. § 702(b). BOC, thereafter, sought permission from this Court to file an interlocutory appeal; that permission was granted on October 25, 1991.

BOC contends that (1) the criminal informations failed to state offenses under the SWMA because used oil is not a waste; (2) the criminal provisions of the SWMA are unconstitutionally vague; (3) the regulation of oil recycling has been pre-empted by federal law; (4) the SWMA unconstitutionally delegates the definition of crimes to an administrative agency; (5) it has been subjected to selective prosecution; (6) it is being prosecuted under *ex post facto* laws; (7) the SWMA imposes unconstitutionally severe penalties for strict liability crimes; and (8) the SWMA violates Section 305 of the Crimes Code, 18 Pa.C.S. § 305, which provides that no strict liability crime can be graded higher than a summary offense.

Section 103 of the SWMA, 35 P.S. § 6018.103, defines a solid waste as follows:

Any waste, including but not limited to, municipal, residual or hazardous wastes, including solid, liquid, semisolid

5. Charges numbered 1–6 are violations of Sections 401, 403, and 501 of the SWMA, 35 P.S. §§ 6018.401, 6018.403, and 6018.501. Charges numbered 7 and 8 are violations of Sections 4107 and 903, respectively, of the Crimes Code, 18 Pa.C.S. § 4107 and § 903.

or contained gaseous materials. The term does not include coal ash or drill cuttings.

Municipal waste is defined by Section 103 of the SWMA as:
Any garbage, refuse, industrial lunchroom or office waste and other material including solid, liquid, semisolid, or contained gaseous material resulting from operation of residential, municipal, commercial or institutional establishments....

Further, residual waste is defined under Section 103 as:
Any garbage, refuse, other discarded material or other waste including solid, liquid, semisolid, or contained gaseous materials resulting from industrial, mining and agricultural operations....

And, hazardous waste is defined by Section 103 as:
Any garbage, refuse, ... and other discarded material including solid, liquid, semisolid or contained gaseous material resulting from municipal, commercial, industrial, institutional, mining or agricultural operations ... which because of its quantity, concentration, or physical, chemical, or infectious characteristics may:
(1) cause or significantly contribute to an increase in mortality or an increase in morbidity in either an individual or the total population; or
(2) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of or otherwise managed.

The definition of "hazardous waste" is further explained by 25 Pa.Code §§ 261.20–261.24. It provides that a solid waste is a hazardous waste if it meets any of these characteristics: (1) ignitability; (2) corrosivity, (3) reactivity; or (4) EP toxicity. The characteristics of ignitability and EP toxicity are relevant to this appeal. Ignitability is defined as follows:
A solid waste exhibits the characteristic of ignitability if a representative sample of the waste has any of the following properties:

(1) It is a liquid with a flash point of less than 60 [degrees] C....

. . . .

25 Pa.Code § 261.21. EP toxicity is defined in 25 Pa.Code § 261.24(a) as follows:

(a) A solid waste exhibits the characteristic of EP toxicity if ... the extract from a representative sample of the waste contains the contaminants listed in Table I at a concentration equal to or greater than the respective value given in the table....

Table I, under this Section, lists the EP toxicity for lead at 5.0 milligrams per liter of waste material.

BOC first contends that used oil is not a waste within the parameters of the SWMA. The record reveals that the oils collected by BOC came from service stations, automobile dealerships, light and heavy industry, government and military facilities. The used oil was discarded by these generators because its quality had deteriorated to the point where it was no longer useful. The used oil generators paid BOC to remove the used oil from their premises; therefore, the used oil was plainly of no value or use to the generators.[6]

The oil derived from service stations and auto dealerships falls within the definition of municipal waste because it is a liquid refuse resulting from the operation of commercial establishments. Further, the oil derived from industrial and government sources falls within the definition of residual wastes because it is a liquid refuse resulting from industrial operations. Additionally, the used oil, because it is rejected as useless by its generators, is within the parameters of the language in Section 103 of the SWMA describing waste generally as any garbage, refuse, other discarded material or other waste. Therefore, we conclude that used oil is a waste for purposes of the SWMA.

6. One generator of used oil, Metropolitan Edison, charged Baumgardner a fee to collect the used oil. Of the numerous generators supplying Baumgardner with used oil, however, Metropolitan Edison was the only supplier to charge for the oil.

■ Moreover, we conclude that the sludge and solvents produced in the reprocessing of used oil at the BOC facility constituted hazardous wastes subject to regulation by the SWMA. First, they are clearly discarded material at a commercial or industrial operation as envisioned by Section 103 of the SWMA. Some of the solvents were disposed of by BOC by adding them to the reprocessed oil and distributing the oil to its customers; the sludge was disposed of on the site of the reprocessing facility. Second, the EP test of the sludge material revealed a concentration of lead in the sludge in excess of the limit listed in Table I of 25 Pa.Code § 261.24. Third, the solvents were found to have a flash point below that accepted for ignitability for a waste not to be classified as hazardous; also the halogenated solvents in question here are listed as hazardous wastes in the Code of Federal Regulations, 40 C.F.R. § 261.31, which is incorporated by reference in 25 Pa.Code § 261.31.

■ BOC argues, however, that collecting and recycling used oil is governed by the Pennsylvania Used Oil Recycling Act (UORA)[7] and, therefore, the SWMA is inapplicable to its used oil recycling operation. We disagree. The definition of "recycle" in Section 3 of the UORA, 58 P.S. § 473 is instructive on this question:

> To prepare used oil for reuse as a petroleum product ... provided that the preparation or use is *operationally safe, environmentally sound and complies with all laws and regulations.*

(Emphasis added.) This language requires the operators of used oil recycling facilities to comply with SWMA as well as all applicable laws and regulations, including the UORA. There are no irreconcilable conflicts between the UORA and the SWMA provisions relevant to this appeal, and there is absolutely nothing in the UORA to indicate that it repealed by implication the SWMA. Hence, we conclude that this argument is without merit.

7. Act of April 9, 1982, P.L. 314, 58 P.S. §§ 471–480.

■ BOC also argues that material in the recycling process is not a solid waste which can be regulated by the SWMA. To support this position BOC cites *American Mining Congress v. Environmental Protection Agency,* 824 F.2d 1177 (D.C.Cir.1987). Because this case construes federal law and regulations, it is not controlling here. In any event, however, *American Mining Congress* could not apply under the facts in this case. *American Mining Congress* prohibited the Environmental Protection Agency (EPA) from regulating materials recycled in *"a continuous process by the generating industry itself."* *Id.* at 1186. We note also that in *American Petroleum Institute v. Environmental Protection Agency,* 906 F.2d 729 (D.C.Cir. 1990), the District of Columbia Circuit distinguished the rule articulated in *American Mining Congress.* That Court held that EPA could regulate material discarded *before* being subject to reclamation; the Court stated that when a material is discarded prior to being reclaimed it becomes part of the solid waste problem, and is, therefore, subject to regulation as a solid or hazardous waste. We conclude that, even assuming federal law applied in this instance, the facts of this case would be within the rule of *American Petroleum Institute* because BOC collects discarded oil from numerous generators before recycling and then reclaims the oil.

■ Next, BOC contends that the SWMA violates federal and state constitutional guarantees of due process because it is too vague to give fair warning as to prohibited acts. BOC argues that none of the definitions of waste in the SWMA suggest that used oil is regulated under the act. We disagree. A statute is void for vagueness when it fails to define an offense with sufficient definiteness so that ordinary persons can understand what conduct is prohibited. *Commonwealth v. Parker White Metal Co.,* 512 Pa. 74, 515 A.2d 1358 (1986). The requirements of due process are satisfied if the statute in question contains reasonable standards to guide the prospective conduct. *Commonwealth v. Heinbaugh,* 467 Pa. 1, 354 A.2d 244 (1976). We

believe that the definitions of municipal, residual, and hazardous waste contained in the SWMA contain reasonable standards sufficient to allow an ordinary person to understand what conduct is proscribed under the Act. The SWMA need not specifically list every conceivable type of garbage, refuse, or discarded material in order to inform fully a person that he or she is subject to the SWMA. BOC is dealing with an unwanted discarded liquid which had its origins in industrial or commercial operations. Baumgardner can reasonably be expected to know this and to comprehend that the SWMA applies to its business activities. Thus, since the SWMA contains a standard definite enough to inform a person what he or she can and cannot do, it is not void for vagueness.[8]

BOC next contends that federal law has preempted the Commonwealth's power to regulate oil recycling under the SWMA. Under the Supremacy Clause, U.S. Const. Art. VI, cl. 2, federal law can preempt state law under three circumstances:

(1) Congress can explicitly define the extent to which its enactments preempt state law;

(2) in the absence of explicit statutory language, state law is preempted where it regulates conduct in a field that Congress intended the federal government to exclusively control; and

(3) state law is preempted to the extent it actually conflicts with federal law.

*English v. General Electric Co.*, 496 U.S. 72, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990).

In the instant case, Baumgardner argues that the Resource Conservation and Recovery Act of 1976 (RCRA), Pub.L. 94–580, 90 Stat. 2795 (codified as amended in scattered sections of 42 U.S.C.), and the Used Oil Recy-

---

**8.** Baumgardner also argues that the UORA suggests to an oil recycler that he or she would not be subject to the SWMA and, thus, magnifies the alleged vagueness of the SWMA. We disagree. Section 3 of the UORA plainly states that used oil recyclers must operate their business in compliance with all applicable laws and regulations. Hence, this argument must fail.

cling Act of 1980, Pub.L. 96–463, 94 Stat. 2055 (codified as amended in scattered sections of 42 U.S.C.), create a federal regulatory scheme displacing state law. Our review of these statutes reveals nothing which would preempt state law in any of the three circumstances listed in *English*. The mere existence of a federal regulatory or enforcement system does not, by itself, imply the preemption of state law. *Id.* Baumgardner also argues that SWMA is preempted because it imposes a more stringent system of enforcement than federal law. State law, however, is not preempted solely because it imposes liability over and above that of federal law. *Id.* Moreover, the RCRA explicitly permits states to impose more stringent regulations than the federal scheme of the RCRA. 42 U.S.C. § 6929. Thus, we can find nothing even suggesting that federal law preempts the SWMA.

BOC further contends that the SWMA delegation of legislative authority to an administrative agency is in violation of the United States Constitution and the Pennsylvania Constitution. Specifically, BOC argues that the legislature unconstitutionally delegated the power to an administrative agency to define what constitutes a crime under the SWMA. An act of our legislature will not be declared unconstitutional unless it clearly, palpably, and plainly violates the constitution. *Gilman v. Unemployment Compensation Board of Review*, 28 Pa.Commonwealth Ct. 630, 369 A.2d 895 (1977). BOC's argument, however, is no more than a bald assertion that the SMWA is unconstitutional, because one may be charged with a crime for violating the Environmental Quality Board's rules. Those rules, however, merely function to amplify the statutes.[9] They do not create "new crimes"; hence, no impermissible delegation has occurred.

BOC next contends that the Commonwealth's decision to prosecute it for criminal violations of the SWMA is selective prosecution and claims that a confrontation

9. BOC does not argue that the rules fail to track the statutes.

occurred with DER during the administrative search of the reprocessing facility, and that this allegedly resulted in spite and ill will on the part of DER which was manifested by the filing of charges against BOC. As further evidence of selective prosecution, BOC claims that it is the only oil recycler ever prosecuted under the SWMA. To establish a claim for selective prosecution based on prosecutorial vindictiveness BOC must demonstrate two factors:

(1) that similarly situated persons have not been prosecuted; and

(2) that it has been intentionally and purposefully singled out for prosecution for an invidious reason.

*Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). The Commonwealth conceded below that no other oil recycling facilities have been prosecuted. BOC's claim, however, that the Commonwealth prosecuted it due to spite and ill will on the part of the DER is a mere allegation, unsupported by any evidence. The fact that DER had a confrontation with BOC during an administrative search of the oil facility is not, by itself, evidence that BOC was singled out for prosecution for an invidious reason. Moreover, the decision to prosecute BOC was *not* made by DER. The Office of the Attorney General, after that agency conducted its own investigation of BOC's oil recycling facility, made the decision to prosecute BOC. Therefore, BOC has failed to demonstrate that it was prosecuted because of vindictiveness.

 BOC also contends that it has been prosecuted under an *ex post facto* law. An *ex post facto* law can arise in four different circumstances. These are where:

(1) a law which makes an act done before the passing of the law, and which was innocent when done, criminal;

(2) a law which aggravates a crime or makes it greater than when committed;

(3) a law which changes the punishment and inflicts a greater punishment than the law in force when the act was committed; and

(4) a law which alters the rules of evidence and requires less or different testimony than the law required at the time of the commission of the offense in order to convict.

*Commonwealth v. Kalck*, 239 Pa. 533, 87 A. 61 (1913). In the present case, the SWMA and its related regulations have been effective since 1980. BOC was charged with violations of the SWMA in 1988. Clearly, the offenses BOC is alleged to have committed occurred well after the SWMA went into effect. We can find nothing in the record suggesting that the SWMA would fall within any of the other categories of *ex post facto* law listed in *Kalck*.

Next, BOC contends that Section 606 of the SWMA, 35 P.S. § 6018.606, offends due process, under both the Constitution of the United States and the Pennsylvania Constitution, because it imposes absolute liability and sanctions in the form of substantial fines and imprisonment for criminal violations of the Act.

It is presumed when construing a statute that the legislature does not intend to violate the Constitution of the United States or the Constitution of Pennsylvania. Section 1922 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922. A legislative enactment is presumed to be constitutional and will not be declared unconstitutional unless it plainly, clearly, and palpably violates the constitution. *Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 507 A.2d 323 (1986). All doubts are to be resolved in favor of the constitutionality of the statute. *Liquor Control Board v. Spa Athletic Club*, 506 Pa. 364, 485 A.2d 732 (1984).

In the context of the SWMA, strict liability or absolute liability means that criminal sanctions may be imposed without the necessity of the Commonwealth proving that a defendant acted with intent to commit a crime. BOC is charged with multiple misdemeanors and a second degree felony for violating the SWMA; the second degree felony carries a potential prison term of two to ten years. The General Assembly explicitly expressed its intent in

Section 606(i) of the SWMA where it states that "[w]ith respect to the offenses specified ... *the legislative purpose is to impose absolute liability for such offenses.*" (Emphasis added.)

 The United States Supreme Court has indicated that due process may set some limits on the imposition of absolute or strict criminal liability, but it has not expounded any definite guidelines as to what those limits might be. *See United States v. Engler*, 806 F.2d 425 (3rd Cir.1986), *cert. denied*, 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987).[10] The penalties contained in the SWMA, however, are not any harsher than the penalties contained in other federal statutes determined by the Supreme Court to be constitutional. For example, in *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), *reh'g denied*, 403 U.S. 912, 91 S.Ct. 2201, 29 L.Ed.2d 690 (1971), the United States Supreme Court has upheld the constitutionality of a strict liability crime, possession of an unregistered firearm, which imposed fines up to $10,000 and/or a maximum of ten years imprisonment. Hence, we hold that Section 606 of the SWMA does not offend due process under the United States Constitution.

BOC also argues that the SWMA violates due process under the Pennsylvania Constitution and cites *Commonwealth v. Koczwara*, 397 Pa. 575, 155 A.2d 825 (1959), *cert. denied*, 363 U.S. 848, 80 S.Ct. 1624, 4 L.Ed.2d 1731 (1960),

**10.** The United States Supreme Court, in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1951), noted that legislation creating strict liability public welfare crimes, such as the SWMA, does not violate due process, because "legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element." *Id.* at 256, 72 S.Ct. at 246. Public welfare offenses proscribe the type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety. *Engler*, 806 F.2d at 439 n. 4. The SWMA is a such a statute. *See Waste Conversion, Inc. v. Commonwealth*, 130 Pa.Commonwealth Ct. 443, 568 A.2d 738 (1990), *petition for allowance of appeal denied*, 525 Pa. 621, 577 A.2d 892, *cert. denied*, —— U.S. ——, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990) (the SWMA is described as a "comprehensive scheme designed to protect the public from health and environmental hazards caused by inadequate solid waste practices").

which held that, under Article I, Section 9 of the Pennsylvania Constitution, a bar owner could not be imprisoned where he was *vicariously* liable for the act of an employee. The holding of *Koczwara* is inapplicable here since BOC is being charged with directly violating the SWMA. Also, BOC cites to *Commonwealth v. Heck,* 341 Pa.Superior Ct. 183, 491 A.2d 212 (1985), which held that Section 3732 of the Vehicle Code, 75 Pa.C.S. § 3732, violated due process under the Pennsylvania Constitution because it permitted a defendant to be convicted of vehicular homicide for acts of ordinary negligence. Our Supreme Court, however, in *Commonwealth v. Heck,* 517 Pa. 192, 535 A.2d 575 (1987), rejected the Superior Court's due process argument, and determined that the Legislature never intended to impose criminal liability for ordinary negligence under Section 3732 of the Vehicle Code. The Supreme Court in *Heck* never reached the precise issue presented here, namely, whether our Legislature violated the Pennsylvania Constitution (or the Constitution of the United States) when it imposed absolute liability for violations of a regulatory statute and permitted the application of the penalties of fines and imprisonment on violators. We hold that Section 606 of the SWMA does not violate due process under the Pennsylvania Constitution.

Finally, BOC contends that the SWMA violates Section 305 of the Crimes Code, 18 Pa.C.S. § 305 because it grades activities for which no culpability is required higher than summary offenses. We must disagree again. Section 305 of the Crimes Code states:

**(a) When culpability requirements are inapplicable to summary offenses and to offenses defined by other statutes.**—The requirements of culpability ... do not apply to:

....

(2) *offenses defined by statutes other than this title, in so far as a legislative purpose to impose absolute liability for such offenses or with respect to any material element thereof plainly appears.*

**(b) Effect of absolute liability in reducing grade of offense to summary offense.**—Notwithstanding any other provision of existing law and *unless a subsequent statute otherwise provides:*

> (1) when absolute liability is imposed with respect to any material element of an offense defined by a statute other than this title and a conviction is based upon such liability, the offense constitutes a summary offense;
>
> . . .

(Emphasis added.) Section 305 of the Crimes Code was effective in 1973; the SWMA, on the other hand, was effective in 1980. It is thus a "subsequent statute" under Section 305(b) of the Crimes Code. Further, the Legislature explicitly stated in Section 606(i) of the SWMA that it intended to impose absolute liability for violation of the SWMA. Hence, since Section 305 of the Crimes Code permits the imposition of absolute liability under the SWMA, BOC's argument must fail.

Accordingly, we affirm the order of the trial court and remand this case for further proceedings.

### ORDER

NOW, March 24, 1992, the order of the Court of Common Pleas of Franklin County in the above-captioned matter is hereby affirmed and this case is remanded for further proceedings.

Jurisdiction relinquished.